The BOARD OF TRADE OF the CITY
OF CHICAGO, Plaintiff-Appellee,

v.

COMMODITY FUTURES TRADING
COMMISSION,
Defendant-Appellant.

No. 79–1278.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1979.

Decided Sept. 12, 1979.

Rehearing and Rehearing In Banc
Denied Nov. 15, 1979.

Gregory C. Glynn, Associate Gen. Counsel, Commodity Futures Trading Co., Washington, D. C., for defendant-appellant.

John E. Angle, Kirkland & Ellis, Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, CUMMINGS, Circuit Judge, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

Finding that an emergency order of the Commodity Futures Trading Commission (Commission) was judicially reviewable, the district court conducted an evidentiary hearing concerning the question of whether there was reason to believe that an emergency existed. Concluding that no emergency existed, the district court enjoined the enforcement of the Commission's order. We vacate the district court's order because we find that the Commission's emergency determination is not judicially reviewable.

### I.

Responding to increased concern over the lack of effective regulation of futures trading, Congress extensively amended the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* (Act),[1] by enacting the Commodity Fu-

---

* Senior District Judge William J. Campbell of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. The Grain Futures Act, which was enacted in 1922, was generally amended by Congress in 1936; its title was changed to the Commodity Exchange Act, 49 Stat. 1491. Prior to the enactment of the CFTC Act of 1974, federal regulation of futures trading markets was relatively limited with regulation of the commodities markets to prevent abuses having been left principally to the commodities exchanges.

tures Trading Commission Act of 1974, Pub.L. 93–463, 88 Stat. 1389 (CFTC Act). The CFTC Act established the Commission, which was granted exclusive jurisdiction to regulate futures trading in numerous commodities. The Commission was provided with broad regulatory and enforcement authority to protect market participants and to insure fair dealing in commodity futures trading.

The Act, as amended, empowers the Commission to direct commodities exchanges to take action in emergency situations. Section 8a(9) of the Act, 7 U.S.C. § 12a(9) provides in relevant part that the Commission is authorized:

"To direct the contract market whenever it has reason to believe that an emergency exists, to take such action as, in the Commission's judgment, is necessary to maintain or restore orderly trading in, or liquidation of, any futures contract. The term 'emergency' as used herein shall mean, in addition to threatened or actual market manipulations and corners, any act of the United States or a foreign government affecting a commodity or any other major market disturbance which prevents the market from accurately reflecting the forces of supply and demand for such commodity . . . ."

On Thursday, March 15, 1979, the Commission, pursuant to this section, issued an order to the Board of Trade of the City of Chicago (Board of Trade) to suspend all trading in the March 1979 Wheat Futures Contract (Contract) for the following day, Friday, March 16, 1979. The order stated that the Commission had reason to believe that an emergency within the meaning of Section 8a(9) of the Act existed with respect to the Contract in that significant transportation and warehouse facility shortages had caused a major market disturbance which prevented the market from accurately reflecting the forces of supply and demand. The order additionally specified that the Commission had reason to believe that there existed a threatened ma-

nipulation or corner in wheat as a consequence of this market disturbance and as a result of the combined long open positions maintained in the Contract by a small number of speculative traders.

The order recited that market surveillance data and information reported to the Commission, and information acquired by it from cash grain merchants, grain elevator operators, and futures commission merchants, indicated that:

"(1) a small number of speculative traders has established and as of this date, is continuing to maintain large, potentially dominant, long open positions in the Contract;

(2) although only four trading days remained before expiration of trading in the Contract on March 21, 1979, this small number of speculative traders is continuing to maintain large long open positions in the Contract while at the same time other traders in the Contract are reducing their long open positions; as a result, the combined long positions of this small number of traders are comprising an increasingly large portion of the total open interest in the Contract as the last day of trading approaches, with that combined interest representing as of this date more than eighty percent of the total open interest in the Contract;

(3) the combined long open positions presently maintained in the contract by the small number of traders substantially exceed the total quantity of wheat currently available in positions from which delivery can be made in fulfillment of the Contract;

(4) even as to wheat currently in deliverable position pursuant to the Contract, not all is acceptable or available for delivery on the Contract in that a portion of this wheat is of undeliverable variety or grade, or is owned by or committed to commercial users;

(5) there is a significant shortage of transportation facilities by which additional wheat may be moved into delivera-

ble position during March 1979, the period allowed for deliveries to be made pursuant to the Contract;

(6) there is a significant shortage of warehouse facilities to accommodate any such additional wheat;

(7) there is a perceived distortion of the price relationships between the Contract and other values of wheat." [App. 1a–2a]

The Board of Trade complied with the Commission's order, and all trade in the Contract was suspended on Friday, March 16. Throughout that day Board of Trade officials and the Commission communicated with each other concerning further trading in the Contract. On that Friday afternoon the President of the Board of Trade advised the Commission that under its own rules it had declared an emergency in the Contract and that trading would be limited to "liquidation only (except new sales for delivery only)."[2] In response to the Commission's inquiry concerning what reasons the Board of Trade intended to announce for issuing the order, the President of the Board of Trade stated that the true reason was the shortened trading period remaining due to the one day suspension of trading ordered by the Commission.[3] After the Commission notified the Board of Trade President that such a reason was unacceptable, the Board of Trade issued its order which stated that "various factors" led to the conclusion that trading in the Contract should be limited to liquidation only.

That same evening the Commission issued a supplemental order. The supplemental order recited that the Commission continued to believe that an emergency existed with respect to the Contract, and that further action was appropriate. The Commission ordered the Board of Trade to:

"(1) immediately terminate all trading in the Contract on March 19, 20, and 21, 1979, the three remaining trading days in the Contract;

(2) permit deliveries of wheat to be made in fulfillment of current open positions in the Contract through the last day permitted for delivery under the rules of the Chicago Board of Trade at the settlement price for the Contract in effect at the close of trading in the Contract on March 15, 1979; and

(3) settle all positions in the Contract remaining open as of the close of business on March 30, 1979, at the settlement price for the Contract in effect at the close of trading in the Contract on March 15, 1979." [App. 5a]

On the next day, Saturday, March 17, the Board of Trade instituted this action in the district court seeking review of the Commission's March 16 supplemental order. The complaint asserted that the Commission's order was arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of the Commission's statutory authority because no emergency existed within the meaning of Section 8a(9) of the Act. The Board of Trade's complaint sought an injunction restraining the Commission from enforcing its March 16 supplemental order.

On Sunday, March 18, the district court conducted an evidentiary hearing on the Board of Trade's motion for a preliminary injunction. The Board of Trade produced five witnesses whose testimony tended to show that no emergency within the meaning of Section 8a(9) existed with respect to the Contract. The Commission offered no evidence at the hearing, but rather stood on the position that its emergency order was not judicially reviewable. At the conclusion of the hearing Judge Grady granted the motion for a preliminary injunction, finding that there was no evidence of any "emergency" as that term is defined in Section 8a(9).

**2.** The Board of Trade's emergency order had the effect of prohibiting a trader from assuming a new position in the Contract. The order did not require traders already in the market to reduce or settle any existing positions which they may have held.

**3.** When the Commission issued its emergency order on March 15, suspending trade in the Contract for the following day, there were four trading days remaining in the Contract. The Commission's order reduced the number of trading days to three.

## II.

The Commission immediately filed a notice of appeal of the district court's decision, and on March 19, 1979, filed in this court an "Emergency Motion for a Stay Pending Appeal." On the same day a panel of this court denied the motion, noting that the applicable statute and nature of the agency determination permitted judicial review of the alleged arbitrariness of the agency decision, and that the complete absence of any support for the Commission's emergency determination left the claim of arbitrary action undisputed. Thereafter the Board of Trade moved to dismiss this appeal, contending that our March 19 order denying the emergency motion for a stay constituted a final determination of the legal and factual issues and is the binding law of the case.[4] We do not agree.

Our March 19 order did not purport to rule on the merits of this appeal. The panel only addressed the question of whether it ought to grant a stay of the district court's injunctive order. In this regard the panel addressed itself to the traditional considerations involved in such a motion: likelihood of success on the merits of the appeal, irreparable harm, and vindication of the public interest. Since the March 19 order only reflected a discretionary ruling by this court and because the panel's statement that the Commission's order was judicially reviewable and that the Commission failed to rebut the charge of arbitrariness were made in connection with a discretionary ruling, and not with respect to a plenary review of the merits of the appeal, we deny the motion to dismiss the appeal.

## III.

The Board of Trade also contends that the appeal should be dismissed because the district court's injunctive order expired simultaneously with the expiration of the Contract on March 21, 1979, and therefore the events, conditions and circumstances giving rise to this case are no longer in existence. Consequently, the Board of Trade argues, the appeal should be dismissed on the ground of mootness. While it is true that the district court's order expired on March 21, 1979, and that the events underlying this controversy are now history, this case falls squarely into the well established exception to otherwise moot litigation.

In *Southern Pacific Terminal Co. v. I. C. C.*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), the Supreme Court recognized that the rule requiring dismissal of an appeal on the ground of mootness does not apply in those situations where, due to the short duration of a challenged agency order, a controversy is "capable of repetition, yet evading review." In nonclass action cases two elements must combine for the case to fall within this exception:

"(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and

(2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again."

*Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975), citing *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

We need go no farther than the facts in this case to find that the challenged order is of sufficiently short duration that full litigation prior to its expiration would be impossible. We are, after all, dealing with perceived emergency situations and the Commission's attempts to take action to maintain or to restore order in the trading of a futures contract. Emergencies are not predictable and, as the circumstances of this case demonstrate, any action taken by the Commission to remedy an emergency is very likely to be short-lived in nature and effect.

It is also reasonable to expect that the Board of Trade and the Commission will

---

4. In an order dated May 3, 1979, this court stated that it would consider the motion to dismiss with the appeal.

find themselves again embroiled in a controversy similar to the one presented by the facts of this case. The Commission is charged with regulating the ten commodity markets in this country. The Board of Trade is the largest such market in the world, and the record shows that it does more business than all of the other exchanges combined. In view of the prominence of the Board of Trade among the commodities exchanges, it is reasonable to anticipate that if a Section 8a(9) emergency arises again the Board of Trade very likely may be subject to a Commission order. The applicability of the "capable of repetition, yet evading review" exception does not depend upon a conclusion that the challenged action must necessarily recur; rather, there need only be a reasonable expectation that it will do so. See: *SEC v. Sloan*, 436 U.S. 103, 109–110, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978). We conclude that it is reasonable to expect that the Board of Trade will be subject again to a Commission's Section 8a(9) emergency order.[5] Consequently we conclude that this case is not moot, and proceed to the merits of the appeal.

## IV.

■ Agency action is exempt from judicial review where a statute precludes such review, or the action is committed to agency discretion by law. 5 U.S.C. § 701(a)(1) and (2). In this case the Commission contends that its determination that an emergency exists within the meaning of Section 8a(9) of the Act and its actions taken with respect thereto are not subject to judicial review. Since no provision of the Act expressly precludes judicial review of the Commission's Section 8a(9) determination and action, the Commission asserts that such a determination and action are not subject to judicial review because they are committed to the Commission's discretion.[6]

The availability of judicial review is not a novel issue. Recently the Supreme Court summarized the state of the law as follows:

"It is now well settled that 'judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.' *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 [87 S.Ct. 1507, 1511, 18 L.Ed.2d 681] (1967). The reviewing court ‧must determine whether 'Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion.' *Barlow v. Collins*, 397 U.S. 159, 165 [90 S.Ct. 832, 837, 25 L.Ed.2d 192] (1970)." (Footnote omitted).

*Morris v. Gressette*, 432 U.S. 491, 501, 97 S.Ct. 2411, 2418–2419, 53 L.Ed.2d 506 (1977).

■ Accordingly we must determine whether Congress impliedly intended to preclude judicial review of the Commis-

---

**5.** We find no merit to the Board of Trade's contention that the "capable of repetition, yet evading review" doctrine can be asserted only by private parties. The argument that the doctrine is unavailable to a government agency is refuted by the very decision which formulated the doctrine. In that decision the Supreme Court stated that the fact "that the Government is the respondent, not complainant, does not lessen or change the character of the interests involved in the controversy, or terminate its questions." *Southern Pacific Terminal Co. v. I. C. C., supra*, 219 U.S. at 516, 31 S.Ct. at 284.

**6.** The Commission concedes that agency action committed to agency discretion is nevertheless judicially reviewable where such action is challenged on constitutional grounds, or upon a claim that the agency has acted in bad faith or in a manner plainly repugnant to its statutory authority. See, *e. g. Leedom v. Kyne*, 358 U.S. 184, 188, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); *Coppenbarger v. Federal Aviation Administration*, 558 F.2d 836, 838 (7th Cir. 1977); *Ness Inv. Corp. v. U. S. Dept. of Agr., Forest S.*, 512 F.2d 706, 716–17 (9th Cir. 1975). The complaint asserted that the Commission's Section 8a(9) determination and action were beyond, and therefore repugnant to the agency's statutory authority because no emergency existed within the definition of emergency contained in Section 8a(9). We view the complaint as a challenge to the merits of the Commission's emergency determination in the context of Section 8a(9). Congress authorized the Commission to make the kind of determination it made in this case so that it cannot be seriously argued that the Commission's emergency order pursuant to Section 8a(9) constitutes agency action repugnant to statutory authority.

sion's actions under Section 8a(9), or committed those actions entirely to the Commission's discretion. In this regard we note that "the ultimate analysis is always one of Congress' intent," *Southern R. Co. v. Seaboard Allied Milling Corp.*, —— U.S. —— at ——, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979), and that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 141, 87 S.Ct. at 1511.

A review of the CFTC Act and its legislative history reveals that the preclusion of judicial review of the Commission's Section 8a(9) actions was not a subject to which Congress explicitly addressed itself. Thus, in determining whether it was the purpose of Congress to preclude judicial review of Section 8a(9) actions by committing such actions entirely to agency discretion (5 U.S.C. § 701(a)(2)), we turn to an examination of the language which Congress employed, the structure of the Act, its legislative history, and the nature of the agency's Section 8a(9) action in the regulatory scheme. See, *e. g., Southern R. Co. v. Seaboard Allied Milling Corp., supra; Morris v. Gressette, supra.*

### A.

■ The language which Congress employed in Section 8a(9) supports the proposition that the Commission's determination of the existence of an emergency is committed to agency discretion. Congress empowered the Commission "whenever it has reason to believe[7] that an emergency exists" to direct contract markets to take any action which, "in the Commission's judgment," is required to maintain order in the trading of a futures contract. The prerequisite for Commission action is its "reason to believe that an emergency exists." That "reason to believe" cannot be based on any perceived emergency, but only upon the type of emergency which Section 8a(9) defines: actual or threatened market manipulations and corners, acts of government affecting a commodity, and any other major market disturbance which prevents the market from accurately reflecting the sources of supply and demand for such commodity.

The legislative history reveals Congressional concern over the Commission's emergency powers and the affect on the commodities markets occasioned by the invocation of those powers. Congress chose to define emergency narrowly in Section 8a(9) so that the Commission could not exert its extraordinary emergency powers except in a case of a defined emergency. See S.Rep. No.93–1131, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. and Admin.News, pp. 5843, 5865; see also Conf.R.No.93–1383, reprinted in *Id.* at 5899–5900. That Congress chose to limit the circumstances in which the agency could invoke its emergency powers does not mean that Congress intended to remove the determination of the existence of an emergency from agency discretion.[8] Rather, it is apparent to us

---

7. The Board of Trade argues that the use of "reason to believe" in Section 8a(9) and in other regulatory statutes signifies a Congressional intent that a decision based on "reason to believe" is judicially reviewable. We reject this talismanic approach in favor of viewing the phrase in the context of the regulatory scheme and the purposes for which Congress enacted the CFTC Act. Congress obviously employed the phrase "whenever it has reason to believe" to indicate that the reason to believe must be held by the Commission. In the instant case the district court substituted its judgment for the Commission's on the threshold question of whether or not an emergency as defined by Section 8a(9) existed. The language of the section clearly does not reflect a Congressional intent that such a substitution of

judgment occur. See *United States v. Southern Railway Company*, 364 F.2d 86, 94–95 (5th Cir. 1966), *cert. denied*, 386 U.S. 1031, 87 S.Ct. 1479, 18 L.Ed.2d 592 (1967).

8. The Board of Trade argues that since Section 8a(9) narrowly limits the situations in which the Commission may invoke its emergency powers, there is "law to apply" to determine whether the Commission's decision is correct, and therefore the Commission's decision is not committed to the agency's discretion. See *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970). This argument overlooks the fact that Section 8a(9) empowers the Commission to take emergency action in face of actual or threatened manipulations and corners—events

that Congress carefully designated the context in which a discretionary decision could be made.

## B.

The structure of the Act also indicates that Congress intended a Section 8a(9) determination to be committed to the Commission's discretion. In Section 6(b) of the Act, 7 U.S.C. § 9, Congress provided that the Commission "may" institute administrative enforcement proceedings against persons it has "reason to believe" are in violation of the provisions of the Act. Judicial review of these proceedings is expressly provided for. Similarly, under Section 6c of the Act, 7 U.S.C. § 13a–1, the Commission "may" institute an action in the district court against individuals or contract markets to enjoin violations of the Act. Within this regulatory scheme Congress provided the Commission with the additional enforcement weapon of emergency powers to be exercised in defined circumstances. We infer from the bestowal of those extraordinary powers a recognition by Congress that, due to the volatile and fluctuating nature of the futures markets, the traditional arsenal of administrative and injunctive enforcement remedies was not sufficient "to give [the Commission] a strong law which will enable it to regulate both agricultural and nonagricultural goods and services in the public interest." S.Rep.No.93–1131 supra, at 5860.

Moreover, Congress provided the Commission with the traditional enforcement remedies of administrative proceedings and injunctive relief in order to prevent violations of the Act. A market emergency, however, is not necessarily the product of an activity in violation of the Act. Congress recognized this possibility when it authorized the Commission to invoke its emergency powers if it has reason to believe that an act of the United States or a foreign government affects a commodity.[9]

## C.

With respect to the nature of the Commission's Section 8a(9) determination, we keep in mind that the Commission's actions under that section are taken in the context of carefully defined emergencies—unforeseen situations which are not amenable to the traditional administrative and injunctive enforcement remedies. The fact that the Commission is authorized by Congress to take emergency action is, in itself, a suggestion of Congressional intent to commit such actions to the Commission's discretion. *Morris v. Gressette, supra,* 432 U.S. at 501, 97 S.Ct. 2411; *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 601–602, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *United States v. Southern Railway Co.,* 364 F.2d 86, 94 (1966), *cert. denied,* 386 U.S. 1031, 87 S.Ct. 1479, 18 L.Ed.2d 592 (1967); *Daugherty Lumber Co. v. United States,* 141 F.Supp. 576, 581 (D.Or.1956).

## D.

The legislative history of Section 8a(9) also indicates that the Commission's determination of the existence of an emergency is a decision committed by Congress to the Commission's discretion. In the Act itself Congress recognized that commodity futures trading is "affected with a national public interest." Congress announced that:

" . . . [T]he transactions and prices of commodity . . . are susceptible to speculation, manipulation, and control,

---

which Congress chose not to define. The detection of manipulations and corners, as well as a "market disturbance which prevents the market from accurately reflecting the forces of supply and demand," is addressed to the expertise Commission with reference to numerous market factors. As such, there is "no law to apply" to determine the correctness of the Commission's decision that an emergency exists within the statutorily defined circumstances.

9. In this regard the Senate Committee on Agriculture, Nutrition, and Forestry recently stated: "[W]hile there is some possibility that a threat to the market may develop with no overt violation of the Act having been committed, the Commission retains the power to take necessary action in the face of an emergency situation under section 8a(9) of the act." S.Rep.No. 95–850, 95th Cong., 2d Sess., reprinted in 1978 U.S.Code Cong. and Admin.News, pp. 2087, 2118.

and sudden or unreasonable fluctuations in the prices thereof frequently occur as a result of such speculation, manipulation, or control which are detrimental to the producer or the consumer . . . and render regulation imperative for the protection of such commerce and the national public interest therein."

7 U.S.C. § 5. Congress made this declaration in enacting the predecessor Grain Futures Act.[10]

Prior to the enactment of the CFTC Act in 1974, federal regulation of commodity future markets was limited in terms both of the commodities regulated and the enforcement powers available to the Commission's predecessor. Congress became aware that regulation under the Act was not in step with the times, since there were many large and important futures which were completely unregulated. The Senate Committee on Agriculture and Forestry stated:

"It is apparent that a regulatory agency cannot be expected to oversee the rapidly expanding and complex futures market without additional tools with which to do the job and proper organization and funding. In addition to proving the tools that the regulatory body would need in preventing violations and disciplining violators directly, its role in supervising exchanges must be substantially expanded. Unquestionably, exchanges are going to have to perform their regulatory role better in order to provide a viable market in which the public can have confidence. The Federal regulatory agency must be given the authority to require that exchanges do so."

S.Rep.No.93–1131, *supra*, at 5859. In view of the need for more effective and more expansive regulation, the Committee resolved that:

"It is, therefore, time to establish a regulatory authority in the commodity field similar to the Securities and Exchange Commission and to give that authority a strong law which will enable it to regulate both agricultural and nonagricultural goods and services in the public interest."

*Id.*, at 5860.

The legislative history reflects considerable attention by Congress to the type of regulatory agency it should establish,[11] and to what regulatory and enforcement powers the agency should have. With respect to the Commission's emergency powers, the House Committee on Agriculture favorably reported out H.R. 13113 which provided the Commission with authority to direct contract markets to act "whenever [the Commission] has reason to believe" that a market condition exists "which threatened orderly trading in, or liquidation of, any futures contract." H.R. 13113, 93d Cong., 2d Sess., § 215 (1974). That Committee noted that the effective use of the emergency power "required the exercise of expert and strictly impartial judgment by the Commission." H.R.Rep.No.93–975, 93d Cong., 2d Sess. at 30 (1974).

The Senate Committee on Agriculture and Forestry "felt that the term 'emergency' was defined too loosely in the House bill and was disturbed by the fact that the Commission would be authorized to use extraordinary powers in cases other than a 'market emergency'." The Senate Committee amended H.R. 13113 to narrow the definition of emergency, and to require the Commission to make a judgment that the emergency itself "must have a greater adverse impact on the market than the action that the Commission proposes to take." The Committee also expressed its intention that the Commission's emergency powers be used "to make the markets work more effectively and to make them a more reliable marketplace." S.Rep.No.93–1131, *supra*, at 5865–66.

---

**10.** See Note 1, *supra*.

**11.** The CFTC Act of 1974 established the Commission as an independent regulatory agency responsible for administering and enforcing the provisions of the Act. Congress gave the Commission exclusive jurisdiction to regulate futures trading. 7 U.S.C. § 2. Congress directed the President to nominate to the Commission persons with expertise in the areas covered by the Act. See: 7 U.S.C. § 4a(a).

The Committee of Conference adopted a compromise of the House and Senate versions of the emergency provision which was enacted as Section 8a(9). The Conference Committee deleted the Senate amendment requiring the Commission to make a judgment on the adverse impact of its proposed emergency actions, noting that "[a]t the outset of an emergency, it may not be practicable for the Commission to reach such a judgment." In cautioning against indiscriminate use of the emergency powers, the Conference Committee stated: "The effective use of the emergency powers requires the careful exercise of expert and impartial judgment by the Commission." Conf.Rep. No.93–1383, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. and Admin.News, p. 5894, at p. 5900.

The legislative history amply demonstrates a congressional purpose to establish a Commission with broad regulatory and enforcement powers, and with the capability and expertise of taking swift and effective action when the Commission has reason to believe an emergency exists. Congress recognized that regulation of the volatile futures markets could be accomplished effectively only through the use of an expert Commission, that situations could occur suddenly for which the traditional enforcement powers would be an inadequate response, and that therefore the Commission should have emergency powers, the exercise of which is committed to the expertise and discretion of the Commission. Judicial review of the Commission's emergency determination would thwart the very purpose for which Congress authorized the emergency powers.

### V.

On the basis of the language which Congress employed, the structure of the enforcement provisions of the Act, the legislative history of the Act as amended, and the nature of the Commission's determination, we conclude that Congress intended to commit a Section 8a(9) determination to the Commission's discretion. We, therefore, conclude that the merits of the Commis-

sion's emergency determination are precluded from judicial review by operation of 5 U.S.C. § 701(a)(2).

For the reasons stated herein we vacate the order enjoining enforcement of the Commission's emergency order, and remand this case to the district court with directions to dismiss the complaint.

VACATED AND REMANDED.