746 F.2d 1300
 Neil F. HARTIGAN, Attorney General of the State of Illinois,
State of Illinois and People of the State of Illinois, ex
rel., Neil F. Hartigan, Illinois Bankers Association, and
Eugene P. Heytow, Petitioners,
v.
FEDERAL HOME LOAN BANK BOARD and Federal Savings and Loan
Insurance Corporation, Respondents.
 Nos. 84-1023, 83-1042 and 84-1053.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 30, 1984.
Decided Oct. 22, 1984.
As Amended Oct. 22, 1984.
 
 Don H. Reuben, Reuben & Proctor, Russell G. Miller, Mass, Miller & Josephson, Richard F. Levy, Levy & Erens, Chicago, Ill., petitioners.
 William K. Black, Denise R. Fields, Office of Gen. Counsel, Washington, D.C., Robert W. Patterson, Michael F. Duhl, John L. Rogers, III, William J. McKenna, Jr., Hopkins & Sutter, Chicago, Ill., for respondents.
 Before BAUER, POSNER, and COFFEY, Circuit Judges.
 BAUER, Circuit Judge.
 
 I. FACTS
 
 1
 First Federal Savings and Loan Association (First Federal) was a large, federally-chartered, mutual savings and loan association with headquarters in Chicago, Illinois. Beginning in 1980, the Federal Savings and Loan Insurance Corporation (FSLIC or the Corporation) and its operating head, the Federal Home Loan Bank Board (Bank Board), became increasingly concerned about First Federal's operating losses, declining net worth, and other financial difficulties. First Federal's losses during the year ended December 31, 1981, increased to $51.6 million, reducing the net worth of the institution to roughly half of its level at the end of 1980. Monthly losses during the first quarter of 1982 continued at an even greater rate.
 
 
 2
 FSLIC and the Bank Board felt that First Federal's financial decline posed a substantial risk to FSLIC's insurance fund and to public confidence in savings and loan associations generally. FSLIC concluded, therefore, that the best hope for protecting both First Federal's depositors and FSLIC's insurance fund would be to provide financial assistance to First Federal on an interim basis until a permanent solution could be devised. Thus First Federal and another troubled Illinois savings and loan were merged to create a "phoenix" association--a troubled institution kept in operation on a temporary basis through substantial financial assistance from FSLIC.
 
 
 3
 FSLIC's financial assistance to First Federal through the phoenix program did not end the institution's problems. Its financial condition continued to deteriorate. First Federal's loss for the fiscal year ended December 31, 1982, was $68.1 million. Even with the provision of over $86 million in FSLIC assistance, First Federal's losses continued through the first ten months of 1983 at a rate of nearly $4.4 million per month.
 
 
 4
 In 1982, Congress enacted the Garn-St. Germain Depository Institutions Act of 1982. Pub.L. No. 97-320, 96 Stat. 1469 (1982) (Garn Act). Title I of the Garn Act was passed in response to "the increasing number of supervisory mergers arranged and, in many cases, assisted by the Federal insuring agencies." S.REP. NO. 536, 97th Cong., 2nd Sess. 3 (1982), reprinted in 1982 U.S.CODE CONG. & AD.NEWS 3054, 3057. Section 123 of the Garn Act, 12 U.S.C. 1730a(m), amended the National Housing Act to give FSLIC and the Bank Board "[expanded] powers to assist troubled thrift institutions." Id. at 7, 1982 U.S.CODE CONG. & AD.NEWS at 3061. These "expanded powers" expire October 15, 1985.
 
 
 5
 Pursuant to its expanded powers under Section 123, FSLIC determined that "severe financial conditions exist[ed] which threaten[ed] the stability" of First Federal. 12 U.S.C. Sec. 1730a(m)(1)(A)(i). FSLIC and the Bank Board determined that the best hope for a permanent solution to First Federal's financial difficulties was to encourage a responsible and financially sound institution to assist FSLIC by acquiring First Federal and thereby buttressing its financial strength. FSLIC therefore held a conference in Chicago on April 28, 1983, to solicit proposals for a solution to First Federal's financial difficulties. FSLIC received only seven proposals to acquire First Federal.
 
 
 6
 On December 15, 1983, the Bank Board met to consider First Federal's financial status and determined, on the basis of detailed financial statements prepared by FSLIC, that the Citicorp proposal presented the only attractive opportunity for solving the problem. The Bank Board thus authorized the acquisition of First Federal by a subsidiary of Citicorp. The Bank Board submitted the proposal to the Federal Reserve Board (FRB) for approval and asked the FRB to expedite its decision on the acquisition. The FRB held an informal hearing on the acquisition on January 11, 1984, and on January 20, 1984, entered an order approving the acquisition subject to certain conditions.
 
 
 7
 On January 6, 1984, the State of Illinois filed a petition in this court to set aside or otherwise review FSLIC's and the Bank Board's authorization of the acquisition. Shortly thereafter, Eugene P. Heytow, one of the seven bidders for acquisition of First Federal, and the Illinois Bankers Association (IBA) also filed petitions challenging the Bank Board's action. The Bank Board and FSLIC immediately moved to dismiss the petition, and raised issues of this court's jurisdiction, standing, and permissible scope of review.
 
 
 8
 Illinois, Heytow, and the IBA (collectively "Petitioners") sought a stay of the Bank Board's authorization and sought to prevent FSLIC from pursuing the regulatory solution to First Federal's problems. After full briefing, a panel of this court on January 17, 1984, denied the motions for a stay pending review and established a briefing schedule on the consolidated petitions, and ordered that the parties address the questions of jurisdiction and standing in their briefs on the merits.
 
 II. JURISDICTION
 
 9
 Under the Administrative Procedure Act an administrative decision is immune from judicial review only if review is expressly precluded by statute or if the agency's action is "committed to agency discretion by law." 5 U.S.C. Sec. 701(a) (1976). This exception is a narrow one; there is a presumption in favor of judicial review. Absent express words in the statute to the contrary, this presumption can be overcome only by "clear and convincing evidence of legislative intent to restrict access" of an aggrieved party to judicial review. Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). The "committed to agency discretion" exception arises only when the statute is drawn in such broad terms that "in a given case there is no law to apply." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820-21, 28 L.Ed.2d 136 (1971).
 
 
 10
 Section 123 of the Garn Act, 12 U.S.C. Sec. 1730a(m) (1982), sets forth the emergency thrift acquisition procedures at issue in this case. Section 123 does not expressly preclude judicial review of FSLIC merger decisions, and the Corporation does not argue that such an express preclusion exists in Section 123. Rather, the Corporation relies upon Section 123 to support its claim that the Bank Board's exercise of its emergency authority is committed to agency discretion by law.[1] The Petitioners, on the other hand, contend that because Section 123 of the Garn Act amends Section 408 of the National Housing Act, 12 U.S.C. Sec. 1730a, Section 123 must therefore be subject to the review provision of Section 408, 12 U.S.C. Sec. 1730a(k).
 
 
 11
 We think that it is clear that Congress did not manifest an intent to preclude judicial review of FSLIC actions under the emergency provisions of the Garn Act. Section 123 of the Garn Act expressly amends the National Housing Act. By amending Section 408 of the National Housing Act with the emergency acquisition provisions, Congress made those provisions subject to Section 408. Moreover, nothing in Section 123 of the Garn Act expressly exempts actions authorized thereunder from judicial review pursuant to subsection (k). When Congress has stated an intention to amend a pre-existing act, this court will not lightly interpret that amendment to preclude the application of the terms of the amended act to the amending provisions. See Republic Steel Corp. v. Costle, 581 F.2d 1228, 1232 (6th Cir.1978), cert. denied, 440 U.S. 909, 99 S.Ct. 1219, 59 L.Ed.2d 457 (1979) (Amendments should be given "the most harmonious, comprehensive meaning possible," avoiding conflicts with the amended provisions.). We therefore hold that emergency acquisitions approved by the Bank Board and FSLIC pursuant to Section 123 of the Garn Act are subject to the review procedures of 12 U.S.C. Sec. 1730a(k).
 
 
 12
 Because we determine that the acquisition is subject to review under Section 1730a(k), we must dismiss the petition with respect to the Bank Board. We agree with the conclusion reached by the Fifth Circuit in Fort Worth National Corp. v. FSLIC, 469 F.2d 47 (5th Cir.1972), that Section 1730a(k) names only FSLIC, and not the Bank Board, as a proper party to an action seeking judicial review of an administrative decision by FSLIC. Id. at 54. The Petitioners have cited us no authority to the contrary and we find no reason to disagree with the rationale of the Fifth Circuit in Fort Worth National Corp.
 
 
 13
 Even if we read Section 123 separately from Section 408 of the National Housing Act, it does not fully foreclose judicial review. Section 123 is not drawn in such broad terms that there is no law to apply. Overton Park, 401 U.S. at 410, 91 S.Ct. at 820. Plainly, there is law in Section 123 to apply, however narrow our ultimate scope of review may be. The Corporation's recitation of the "discretion" language in Section 123 is improperly couched as an argument that Section 123 is broadly drawn within the meaning of Overton Park. As we explain in part IV of the opinion, this "discretion" language defines the scope of our review in this case.
 
 
 14
 The Corporation nonetheless argues that our decision in Board of Trade of Chicago v. Commodity Futures Trading Commission, 605 F.2d 1016 (7th Cir.1979), cert. denied, 446 U.S. 928, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980), compels us to preclude judicial review because the statute in Board of Trade gave the CFTF special powers to deal with emergencies. In Board of Trade we concluded that "[t]he fact that the Commission is authorized by Congress to take emergency action is, in itself, a suggestion of Congressional intent to commit such actions to the Commission's discretion." 605 F.2d at 1023. The Corporation therefore argues that because Section 123 authorizes it to take emergency actions, judicial review similarly is precluded here. In Board of Trade, however, a panel of this court found that the statute at issue provided no guidelines by which a reviewing court could test the validity of the CFTC's administrative decisions when Congress had empowered the Commission "to direct contract markets to take any action which, 'in the Commission's judgment,' is required to maintain order in the trading of a futures contract." Id. at 1022. We find that no such broad grants of authority are given FSLIC in this case.
 
 
 15
 Section 123 does provide that FSLIC, "upon its determination that severe financial conditions exist which threaten the stability of a significant number of insured institutions, or of insured institutions possessing significant financial resources, may authorize, in its discretion and where it determines such authorization would lessen the risk to the Corporation" certain extraordinary merger or consolidation arrangements not otherwise available under federal banking laws. 12 U.S.C. Sec. 1730a(m)(1)(A)(i). If this were all the direction that Section 123 gave to FSLIC, they would have a much stronger case for nonreviewability. But Section 123 provides much more. Subsection (1)(B) provides that the FSLIC shall consult with the State official having jurisdiction of the acquired institution, who shall be given the opportunity to object to any acquisition, and, upon objection by the appropriate State official, FSLIC shall use its authority only upon unanimous consent of the Bank Board. 12 U.S.C. Sec. 1730a(m)(1)(B)(i), (ii), and (iii). Moreover, subsection (3) provides the procedure and priorities of consideration which FSLIC is to use when bidders for an institution are not all in-State insured institution or an in-State savings and loan holding company. 12 U.S.C. Sec. 1730a(m)(3).
 
 
 16
 Section 123 of the Garn Act thus establishes a series of lengthy procedural steps, many of which involve consultation or interaction with persons and entities other than respondents--e.g., consultation with State officials, solicitation of first bids (and, if appropriate, second bids), calculations of the costs of offers and reoffers, and consideration of an elaborate set of priorities. Unlike Board of Trade, and other cases where judicial review has been precluded under the "committed to agency discretion by law" standard, there is law to apply under Section 123. Congress recognized the potential effects of the broadened acquisition powers it gave to respondents under the Garn Act and therefore created a statutory scheme studded with safeguards and checks on discretion. We are convinced, therefore, that Congress did not intend to foreclose judicial review of FSLIC's decision. Thus the Corporation's acquisition decisions are subject to judicial review as provided in Section 408(k) of the National Housing Act, 12 U.S.C. Sec. 1730a(k).
 
 III. STANDING
 
 17
 Next we must determine which of the Petitioners have standing to assert a claim for review under the National Housing Act. Subsection 408(k) provides that "[a]ny party aggrieved by an order of the Corporation under this section may obtain a review of such order .... Review of such proceedings shall be had as provided in chapter 7 of Title 5." 12 U.S.C. Sec. 1730a(k). Because subsection (k) does not further define who are aggrieved parties under the section, we turn to the Administrative Procedure Act (APA) for an understanding of who is an aggrieved party.
 
 
 18
 A person is aggrieved within the meaning of the APA if he alleges that he has or will sustain some actual or threatened injury in fact resulting from the challenged agency action and the alleged injury was to an interest arguably within the zone of interests protected or regulated by the statute in question. Alschuler v. Dept. of Housing & Urban Development, 686 F.2d 472, 477 (7th Cir.1982); Concerned Residents of Buck Hill Falls v. Grant, 537 F.2d 29, 33 (3rd Cir.1976). For this analysis, we must undertake a separate analysis of standing for each of the petitioners. Cf. Alschuler, 686 F.2d at 477 ("The zone of interest test requires making a separate analysis of standing for each claim raised."). The most difficult part of the standing analysis, of course, is whether a party's claimed injury falls within a zone of interest protected by the Garn Act.
 
 A. State of Illinois
 
 19
 The State of Illinois contends that it has standing in this case to challenge FSLIC's action because of the language of Section 123 which provides that "[b]efore making a determination to take any action under subparagraph (A), the Corporation shall consult the State official having jurisdiction of the acquired institution." 12 U.S.C. Sec. 1730a(m)(1)(B)(i). The Corporation contends that this provision only applies to proposed transactions involving state-chartered savings and loans and not federally-chartered savings and loans such as First Federal. The Corporation claims support for this position in the legislative history of the Garn Act. Specifically the Corporation points to S. REP. NO. 536, 97th Cong., 2nd Sess. 7, that "[i]n the case of a state-chartered institution, before proceeding with the bidding process, the FSLIC must consult with the appropriate State regulator." 1982 U.S.CODE CONG. & AD.NEWS at 3061.
 
 
 20
 This language did not appear in the Senate Conference Report issued twenty-seven days later. S.CONF.REP. NO. 641, 97th Cong., 2d. Sess., reprinted in 1982 U.S.CODE CONG. & AD.NEWS 3128. Nor does comparable limiting language appear in the final version of the Garn Act.
 
 
 21
 In light of the different language in the two reports, we find the omission of the "state-chartered" language significant to our construction of the language of the statute as finally enacted. See Dept. of Air Force v. Rose, 425 U.S. 352, 366-67, 96 S.Ct. 1592, 1601-02, 48 L.Ed.2d 11 (1976) (Congressional Report which was before both houses of Congress given greater weight in interpreting statute than committee report before only one house.); United States v. Lincoln Rochester Trust Co., 297 F.2d 891, 893 (2d Cir.1962) (Language in House report not included in act as finally passed cannot be relied upon in interpreting the act.). Our conclusion, therefore, is that Section 123 applies whether the transaction under consideration by FSLIC involves either a federally or a state-chartered savings and loan institution. In this case both the Illinois Commissioner of Banks and Trust Companies and the Illinois Commissioner of Savings and Loan Associations had jurisdiction over one or more aspects of First Federal's operations,[2] and thus should have been consulted regarding proposed Bank Board action involving First Federal. Given, therefore, that these State officials should have been consulted by FSLIC, the State of Illinois clearly is an aggrieved party and the Attorney General may properly assert the rights of the State.
 
 
 22
 Our analysis of Illinois' standing does not conclude here. In its brief and in oral argument the State of Illinois asserted that "[t]he Federal Reserve Board Order of January 20, 1984 recognized these threatened injuries ... [to the State from the acquisition] and placed certain interim restraints on Citicorp's operation of First Federal." State of Illinois' br. at 26. On the basis of these representations by the State of Illinois that in retrospect their concerns have been met, we hold their appeal in this case moot.
 
 B. Eugene P. Heytow
 
 23
 In response to FSLIC's request for bids to acquire First Federal, a group of investors headed by Eugene P. Heytow (Heytow), a Chicago banker, proposed to establish a savings and loan holding company to acquire First Federal. Heytow's bid was ultimately rejected by FSLIC. Heytow's claim is that his injury results from FSLIC's failure to follow the statutorily prescribed bidding procedures and that that failure is the cause of his injury which can be redressed by this court. Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).
 
 
 24
 Heytow clearly has standing to challenge the Corporation's decision. He was entitled to and did participate in the bid solicitation and authorization proceedings conducted by FSLIC under Section 123, and therefore is a person "deemed or admitted as a party ... in an agency proceeding." 5 U.S.C. Sec. 551(3). Heytow is an aggrieved party because his bid was rejected, and he claims, at least, that under Section 123 that rejection was wrongful and directly traceable to the Corporation's conduct. Heytow asserts at least an arguable case for redress when he asserts that FSLIC on two different occasions has stated two different valuations of the equity in his bid proposal, and thus raises a valid claim that the Corporation acted arbitrarily in evaluating his bid.
 
 C. Illinois Bankers Association
 
 25
 The Illinois Bankers Association (IBA) is a trade association consisting of 1146 state and federally-chartered Illinois commercial banks. In order for the IBA to have standing under the APA, it must allege injury in fact to its members, and that injury must be at least arguably within the zone of interests protected by Section 123. United States v. S.C.R.A.P., 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The injury which the IBA asserts is two fold: that its members include bidders or potential bidders to acquire First Federal and that its members are competitors of First Federal.
 
 
 26
 On the record before us, IBA lacks standing as a representative of actual bidders for First Federal. Only one bank, First Chicago Corporation, submitted a bid for First Federal, but withdrew that proposal before final action by FSLIC. Nor can we see how the IBA has standing on behalf of potential bidders, and the IBA's brief provides us no assistance in this regard. Potential bidders are those who never submitted a bid to acquire First Federal and therefore have no standing to claim any errors with the bidding process.
 
 
 27
 The IBA's best claim for standing is that its members are competitors of the successful bidder, Citicorp.[3] The IBA claims that many of its members will be harmed by Citicorp's competitive advantage as a result of the acquisition, especially in many of Illinois' smaller counties. The injury apparently results to IBA's members because Citicorp is a stronger savings and loan than First Federal and that the IBA members thus have lost some of their competitive advantage. The Supreme Court has held that such a loss of competitive advantage, however small that loss may be, is the type of palpable economic injury that is recognized as sufficient to lay a basis for standing. Ass'n of Data Processing Serv. Org. v. Camp, 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).
 
 
 28
 Our inquiry into IBA's standing does not end here. The second prong of the standing test requires that the IBA have suffered the kind of injury arguably within the zone of interest protected by the statute. In this respect, the IBA fails in its claim of standing. The IBA asserts that the Garn Act seeks a continuation of free competition and that accordingly the IBA, as a representative of competitors, is entitled to press its claim that both FSLIC's procedures and its substantive decisions injure the industry-wide balance of competition among its member banks.
 
 
 29
 The competitive aspects which the Garn Act seek to protect are the same as those protected generally under the National Housing Act. These protections are embodied in 12 U.S.C. Sec. 1730a(e)(2). The Act provides that FSLIC "shall not approve any proposed acquisition ... the effect of which in any section of the country may be substantially to lessen competition ...." 12 U.S.C. Sec. 1730a(e)(2)(B). The injury which the IBA claims on behalf of its members is that FSLIC has "injure[d] the industry-wide balance" in the home mortgage industry. IBA br. at 25-26. The IBA claims that as a result of the merger, Citicorp has approximately 5.1% share of the mortgage lending market in Illinois--a 0.6% greater share than First Federal's 4.5% share of that market in 1982. We do not think that this shift in the competitive balance can arguably amount to a substantial lessening of competition, and thus the injury which the IBA claims that its members suffer is not within the zone of interest protected by Section 1730a(e)(2).
 
 IV. SCOPE OF REVIEW
 
 30
 Having determined that Heytow is the only party with standing whose appeal is not moot, we must now determine the extent to which we can review FSLIC's administrative decision in this case. Our review is governed by Chapter 7 of the Administrative Procedure Act (APA), 5 U.S.C. Secs. 701-706. The APA provides that this court "shall ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be--(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." Id. Sec. 706. The APA, along with the statutory authority of FSLIC set forth in Section 123 of the Garn Act, determine our scope of review.
 
 
 31
 Section 123 of the Act begins by providing that FSLIC, "upon its determination that severe financial conditions exist which threaten the stability of a significant number of insured institutions, or of insured institutions possessing significant financial resources, may authorize, in its discretion and where it determines such authorization would lessen the risk to" FSLIC, a transaction under the statute. 12 U.S.C. Sec. 1730a(m)(1)(A)(i). This provision focuses on the Corporation's evaluation of the risk to the insurance fund of various courses of action and of the cost to the fund of various solutions. The provision requires the Corporation to exercise its expertise in evaluating the structure, terms, and conditions of a proposal so that the risk to the insurance fund can be weighed. Congress did not confine FSLIC's evaluation of these factors by any standards, but rather opted for maximum flexibility by committing the matter entirely to the Corporation's discretion. This provision grants the Corporation the broadest possible discretion to evaluate the savings and loan in terms of the severity of the financial situation and the severity of the risk to the insurance fund. First Federal's financial difficulties are set forth in part I of this opinion. We find no abuse by the Corporation in finding an emergency existed with regard to First Federal.[4]
 
 
 32
 When the Corporation moves beyond evaluating the risks inherent in the structure and terms of a proposal to the evaluation of the proposal's costs in dollar terms, the Act is also explicit in the extent to which the Corporation's evaluation is subject to review. Congress provided that "[i]n determining the cost of offers and reoffers under this subsection, the Corporation's calculations and estimations shall be determinative." 12 U.S.C. Sec. 1730a(m)(3)(E). No clearer language could have been chosen to express the intent of Congress that the Corporation's calculations and estimations of the respective costs of various offers would be subject only to the vary narrow judicial review of abuse of discretion.
 
 
 33
 As a result of the Corporation's bidding process, the Corporation will enter into a lengthy partnership with the winner of the bidding process, and the eventual costs to FSLIC will unavoidably depend on complex projections and assumptions concerning long-range economic conditions. The requirement that the Corporation's calculations be "determinative" gives the Corporation a way to protect itself from offers based on unreasonable assumptions or economic projections. By permitting the Corporation to recalculate the offers in a manner that is determinative, Congress insured that FSLIC, as the entity at risk and with the expertise in the area, would be able to analyze the bids in terms of consistently applied assumptions and thus to make meaningful judgments concerning its potential partner's future performance.
 
 
 34
 The Corporation's authority to recalculate bids does not remove that recalculation completely from our review. The Corporation's methodology and the economic assumptions applied to the bids are not subject to our review. We can review, however, the Corporation's bid evaluation process to assure ourselves that the Corporation has acted consistently in the application of the methodology and assumptions to the various bids.
 
 
 35
 Heytow argues that we should undertake such a review in this case and that this review should be a searching one. Heytow argues that the record presented to this court, on its face, raises "grave doubts ... as to whether FSLIC and the Bank Board acted on the 'basis of some standard.' " Heytow's br. at 19. Specifically, Heytow points to two passages in the record wherein "FSLIC recommended rejection of Heytow's bid because it purportedly offered no equity investment (R. at [A]37), while at the same time, FSLIC valued Heytow's bid with a $50 Million equity investment. (R. at 500)." Heytow's br. at 19. Although Heytow contends that this is "but one example of facts which are inconsistent with the Decision and are not explainable on the incomplete Record before this Court," Id., Heytow cites us no other inconsistencies in the record presented.
 
 
 36
 We think that Heytow misreads the record of the Bank Board proceedings. During the Bank Board's closed meeting on December 15, 1983, Mr. Taylor, of the Office of Federal Savings and Loan Insurance Corporation, in response to Board member Gray's questions about FSLIC's efforts to find an acceptable Illinois bidder, discussed Heytow's bid and stated:
 
 
 37
 Mr. Heytow's bid was an exceptionally costly and risky one. He asked for a guaranteed profit and he asked for very large FSLIC purchase of low yielding preferred stock repayable from income and a variety of other elements of assistance which are detailed in the material before you.
 
 
 38
 On the basis of an evaluation of that bid, and all of these evaluations were ongoing at the same time, commencing on June 10, the staff advised Mr. Heytow that that particular bid had a cost, a risk to the FSLIC, and other characteristics that the staff thought could not be responsibly recommended to the Board. One of the major characteristics lacking in that bid was any element of investment by Mr. Heytow and his associates in the company.
 
 
 39
 MR. GRAY: Would you characterize that bid as constituting essentially a loan? Or how would you--
 
 
 40
 MR. TAYLOR: I would constitute it as--I would describe it as cherry picking, sir. It was a request that the Federal Savings and Loan Insurance Corporation pay what we estimated at that time and currently estimate to be over $700 million to an organization to be placed under Mr. Heytow's control or that of his associates, in return for no investment by Mr. Heytow.
 
 
 41
 MR. GRAY: No infusion of capital.
 
 
 42
 MR. TAYLOR: Mr. Heytow would have arranged for a loan from Heytow Associates funded by the two underwriting banks--First National Bank of Chicago and Continental Illinois, but he would have had no equity investment in the company. Mr. Heytow did revise his bid at the invitation of the staff. The bid is different in detail as revised but it has the same basis features; no equity investment, high cost and risk, and the cost estimates are at page 24 in the A Memorandum before you.
 
 
 43
 Ad.R. at A36-38. Page 500 of the Administrative Record, to which Heytow points as being in conflict with the FSLIC's statements at the Board meeting, actually supplements Taylor's statements. Page 500 of the record states that as part of Heytow's bid, First Federal (the acquired institution) "raises equity funds through sale of additional common stock in the estimated amount of $50 million." This statement says nothing about Heytow's own equity contribution to the bid, which was the subject of Taylor's discussion at the Board meeting. We think, therefore, that contrary to Heytow's contention that inconsistencies exist on the face of the record before us, that the Board's discussion of Heytow's equity investment is entirely consistent.
 
 
 44
 Because we find that Heytow's initial attack on the record fails, we must now decide whether we will require FSLIC to further supplement the record before us in order to allow Heytow to continue his search for a way to overturn the Corporation's acquisition decision. Heytow claims that the record must be supplemented in order for this court to be able to properly determine whether the Corporation abused its discretion in determining the cost of Heytow's bid vis-a-vis Citicorp's bid for First Federal. Heytow thus asks us to require that the Corporation submit to this court the detailed financial work papers prepared by FSLIC's Quantitative Analysis Division. The Corporation argues that to require it to supplement the over 800 pages of record already submitted to this court and thus submit its complicated calculations for review could turn this proceeding into a protracted dispute. The Corporation argues that it could not safely act to solve a financial emergency confronting it without having an adverse impact on the willingness of financial institutions to participate in the process and to make their best offer to assist the FSLIC with troubled institutions. In its motion to file the administrative record under seal, FSLIC articulated its reluctance to further supplement the record because the bids were accepted by FSLIC with either an express or implied request for confidentiality by the bidders. Information such as that contained in the bids is generally maintained by FSLIC in strict confidence and is unavailable pursuant to either the Freedom of Information Act, 5 U.S.C. Sec. 552(b)(4) & (8), or 12 C.F.R. Sec. 505.5. We consider these concerns valid reasons for the Corporation's reluctance to supplement the present record. See, e.g., National Parks and Conservation Assn'n v. Morton, 498 F.2d 765 (D.C.Cir.1974) (applying the 552(b)(4) exemption).
 
 
 45
 Under 5 U.S.C. Sec. 706 this court is empowered to review either "the whole record or those parts of it cited by a party" to determine whether the agency's decision was arbitrary. We must assure ourselves that the agency has presented this court with a record that "demonstrates that its conclusions are based upon sufficient foundations." Collette Travel Service, Inc. v. United States, 263 F.Supp. 302 (D.R.I.1966). Although the Corporation may have used quantitative analyses not included in the record before us in making its decision to accept Citicorp's bid for First Federal, these analyses may be excluded from review "because of concerns over proper agency functioning." Madison County Building & Loan Assn. v. Fed. Home Loan Bank Board, 622 F.2d 393, 395 n. 3 (8th Cir.1980). Because we have found that Heytow fails to raise a substantial question about the validity of the Corporation's bid evaluation on the 800 page record before us, we think that it is unnecessary in this case to require an additional record with which Heytow can continue to fight a facially rational decision by the Board. This court should not allow parties to contest the Corporation's actions without a facially apparent reason for so doing and on this basis of speculation and thereby run great risks of frustrating FSLIC's emergency authority. We thus find it unnecessary to supplement the record before us because on the basis of the present record we find a reasoned basis for the agency's decision. See Superior Oil Co. v. Watt, 548 F.Supp. 70, 73 (D.Del.1982).
 
 
 46
 We thus hold that this court has jurisdiction under 12 U.S.C. Sec. 1730a(k) to review acquisitions sanctioned by FSLIC under Section 123 of the Garn Act, and determine on the basis of the record before us that the decision of FSLIC to allow Citicorp to acquire First Federal should be affirmed. Each party shall bear its own costs.
 
 
 47
 SO ORDERED.
 
 
 
 [1]
 Section 123 of the Garn Act provides in part that Section 408 of the National Housing Act shall be amended to read:
 (m)(i) Notwithstanding any provision of the laws or constitution of any State or any provision of Federal law, except as provided in subsections (e)(2) and (l ) of this section, and in clause (iii) of this subparagraph, the Corporation, upon its determination that severe financial conditions exist which threaten the stability of a significant number of insured institutions, or of insured institutions possessing significant financial resources, may authorize, in its discretion and where it determines such authorization would lessen the risk to the Corporation, an insured institution that is eligible for assistance pursuant to section 1729(f) of this title to merge or consolidate with, or to transfer its assets and liabilities to, any other insured institution or any insured bank (as such term "insured bank" is defined in section 1813(h) of this title), may authorize any other insured institution to acquire control of said insured institution, or may authorize any company to acquire control of said insured institution or to acquire the assets or assume the liabilities thereof.
 (ii) Mergers, consolidations, transfers, and acquisitions under this subsection shall be on such terms as the Corporation shall provide.
 12 U.S.C. Sec. 1730a(m)(1)(A)(i) & (ii).
 
 
 [2]
 The Illinois Commissioner of Banks and Trust Companies has jurisdiction over the trust activities of First Federal pursuant to Ill.Rev.Stat. ch. 17, Secs. 455 & 1551-1570 (Smith-Hurd 1981) and jurisdiction over all federal savings and loan associations under the Electronic Fund Transfer Transmission Facility Act, id. Sec. 1301 et seq. Similarly, the regulatory powers of the Illinois Commissioner of Savings and Loan Associations expressly include jurisdiction over federal savings and loan associations. Id. Secs. 3174 & 3181
 
 
 [3]
 The IBA also contends that its standing is based on its concerns for the integrity of the Illinois banking laws. We find this reason to be insufficient to give rise to a cognizable injury under the APA, and that it cannot be a basis for the IBA's standing
 
 
 [4]
 Although the Petitioners attempt to discredit the existence of an emergency because the Corporation took eight months to decide on its final course of action for First Federal, we think that the eight month period exemplifies a cautious effort by the Corporation to make a thorough yet prompt attempt to deal with difficult financial decisions with wide-ranging implications