

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-1-1999

# Cncl of Alternative Parties v. Hooks

Precedential or Non-Precedential:

Docket 98-5256

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Cncl of Alternative Parties v. Hooks" (1999). *1999 Decisions.* Paper 146.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/146

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

U.S. 3rd Circuit Court of Appeals

CNCL OF ALTERNATIVE v HOOKS

Filed June 1, 1999

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 98-5256

THE COUNCIL OF ALTERNATIVE POLITICAL PARTIES, GREEN PARTY OF NJ, NATURAL LAW PARTY, NJ CONSERVATIVE PARTY, NJ LIBERTARIAN PARTY, US TAXPAYERS PARTY OF NEW JERSEY, ALBERT LAROTONDA, GARY NOVOSIELSKI, MADELYN HOFFMAN, JIM MOHN, MARY JO CHRISTIAN, JEFFREY M. LEVINE, TOM BLOMQUIST, BERNARD SOBOLEWSKI, SAL DUSCIO, ANNE STOMMEL, LEONARD FLYNN, JOHN PAFF, MICHAEL BUONCRISTIANO, EMERSON ELLETT, CHARLES NOVINS, LOWELL T. PATTERSON, EUGENE R. CHRISTIAN, SCOTT JONES, RICHARD S. HESTER, SR., BARBARA HESTER, AUSTIN S. LETT, ARNOLD KOKANS, LEONA LAVONE, SHIRLEY BONCHEFF, CHRISTIAN ZEGLER, VICTORIA SPRUIELL, HARLEY TYLER,

v.

LONNA R. HOOKS, Secretary of State of the State of New Jersey, in her official capacity and her successors, Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY (D.C. No. 97-cv-01966) (District Judge: Honorable Mary Little Cooper)

Argued: November 4, 1998

Before: SCIRICA, ALITO, Circuit Judges, and GREEN, Senior District Judge*
_____

* The Honorable Clifford Scott Green, United States Senior District Judge for the Eastern District of Pennsylvania, sitting by designation.

(Opinion Filed: June 1, 1999)

PETER VERNIERO ATTORNEY GENERAL OF NEW JERSEY JOSEPH L. YANNOTTI ASSISTANT ATTORNEY GENERAL OF COUNSEL DONNA KELLY (ARGUED) SENIOR DEPUTY ATTORNEY GENERAL R.J. Hughes Justice Complex P.O. Box 112 Trenton, New Jersey 08625

Counsel for Defendant-Appellant

LENORA M. LAPIDUS DAVID R. ROCAH (ARGUED) AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY 35 Halsey Street, Suite 4B Newark, New Jersey 07102

Counsel for Plaintiffs-Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

This appeal concerns the constitutionality of a provision of New Jersey's election law, N.J.S.A. § 19:13-9, that, as recently amended, requires independent and so-called "alternative political party" candidates seeking access to the general election ballot to file nominating petitions by the day of the primary election. Because we conclude that the filing deadline is a reasonable, nondiscriminatory regulation, justified by New Jersey's important regulatory interests, we reverse the decision of the District Court declaring § 19:13-9 unconstitutional and enjoining its operation.

I.

The plaintiffs in this case -- the Council of Alternative Political Parties, various alternative political parties,1 several candidates for elective office, and several voters -- commenced this action on April 8, 1997, pursuant to 42 U.S.C. § 1983, alleging that the filing deadline set out in N.J.S.A. § 19:13-9 (amended 1999) imposed a"severe" burden on the right to vote, the right to free association, and the right to the equal protection of laws under the First and Fourteenth Amendments. (See Amended Complaint, May 23, 1997, at 18-20). At that time, N.J.S.A.§ 19:13-9 required all candidates seeking a place on the general election ballot to file nominating petitions 54 days before the primary election. On May 9, 1997, the plaintiffs moved for a preliminary injunction to restrain the Secretary of State from refusing to accept nominating petitions submitted after the filing deadline.2 The District Court denied their motion on June 17, 1997, finding that although the plaintiffs were likely to succeed on the merits and would be irreparably harmed if relief were not granted, the State would be more severely harmed, and the public interest disfavored such relief.

The plaintiffs filed a timely appeal on June 23, 1997, seeking an expedited review and an injunction pending appeal. This Court granted their request for expedited review and heard argument on July 21, 1997. Relying primarily on the Supreme Court's decision in Anderson v. Celebrezze, 460 U.S. 780 (1983), a panel of this Court (the "prior panel") concluded that the plaintiffs were likely to succeed on the merits and that the remaining preliminary injunction factors favored granting their prayer for relief.

_____

1. The alternative political parties in this case are the Green Party of New Jersey, the Natural Law Party, the New Jersey Conservative Party, the New Jersey Libertarian Party, and the U.S. Taxpayers Party of New Jersey. The Council of Alternative Political Parties is an unincorporated association that represents these alternative political parties.

2. Since commencement of this action, the statutory electoral duties of the Secretary of State have been transferred to the Attorney General pursuant to an Executive Reorganization Plan. For convenience, we refer to the defendant as the "State." Council of Alternative Political Parties v. Hooks , 121 F.3d 876, 884 (3d Cir. 1997). The prior panel therefore reversed the decision of the District Court and ordered the entry of preliminary relief in favor of the plaintiffs.3 Id. Pursuant to an interim consent order, the parties agreed to extend the 1998 filing deadline from April 9 to July 27, 1998.

The plaintiffs then moved for summary judgment. Premising its ruling on the prior panel's decision and concluding that there were no genuine issues of material fact, the District Court granted the plaintiffs' motion. See Council of Alternative Political Parties v. Hooks , 999 F. Supp. 607 (D.N.J. 1998). The State then took this appeal, and we heard argument on November 4, 1998. On December 24, 1998, after we heard oral argument, the New Jersey Legislature amended section 19:13-9, effective January 1, 1999, so that nominating petitions are no longer due 54 days before the primary, as they were under the version of the law examined by the District Court and the prior panel, but are due by the day of the primary. In light of this amendment, we requested additional briefing from the parties on whether New Jersey's recently amendedfiling deadline violates plaintiffs' First and Fourteenth Amendment rights. Although plaintiffs acknowledge that "the amended statute is an improvement over the former statute," they assert that "it continues to impose an unconstitutional burden on alternative political party candidates and is not justified by any legitimate state interest." Appellees' Supplemental Br. at 1. The State, on the other hand, asserts that the amended statute is "equally constitutional" to the prior statutory deadline and is "illustrative that New Jersey has a viable and open electoral process . . . ." Appellant's Supplemental Br. at 3.

II.

In determining whether New Jersey's amended filing deadline imposes an unconstitutional burden on

plaintiffs' rights, we begin by examining New Jersey's ballot access scheme in its entirety. Williams v.
Rhodes, 393 U.S. 23, 34

_____

3. Judge Scirica dissented, finding that plaintiffs had not established a likelihood of success on the merits.
Hooks, 121 F.3d at 884-86. (1968); Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd.,
844 F.2d 740, 741 (10th Cir. 1988).

Under New Jersey law, the general election for candidates seeking statewide or local office takes place on
the first Tuesday after the first Monday in November, N.J.S.A. § 19:2-3, and the primary election takes
place on the first Tuesday after the first Monday in June. See N.J.S.A. § 19:2- 1; see also N.J.S.A. §
19:1-1 (defining "primary election" as "the procedure whereby the members of a political party . . . nominate
candidates to be voted for at general elections . . . ."). To obtain placement on the November general
election ballot for statewide or local office, 4 a candidate may take one of the two mutually exclusive routes:
the primary election process or the petition process.

The first route, the primary election process, is available only to candidates representing a "political party,"
as defined under New Jersey's election law. See N.J.S.A. § 19:1-1. Under that law, a "political party" is any
party that garners at least 10% of the votes cast in the last general election for the office of the member of
the General Assembly. Id. At present, the only recognized political parties in New Jersey are the
Democratic and Republican parties.

Candidates participating in the primary election process begin their electoral involvement by filing nominating
petitions at least 54 days before the primary election. See N.J.S.A. § 19:23-14. Petition forms are made
available in late December to early January, but candidates are free to create their own forms and to begin
soliciting signatures at any time. See N.J.S.A. § 19:23-7 (contents of petition).

The number of eligible voters required to sign a nominating petition varies, depending on the office sought.
For instance, candidates running for Governor or United

_____

4. Unlike candidates seeking statewide or local offices, candidates seeking the presidency must file a
nominating petition with the requisite number of signatures 99 days before the general election. In 1997, the

presidential filing deadline was July 28. The previous filing deadline was 40 days before the primary election, but after Anderson this deadline was struck down as unconstitutional as applied to presidential elections. See LaRouche v. Burgio, 594 F. Supp. 614 (D.N.J. 1984). States Senator must obtain the signatures of 1,000 voters. See N.J.S.A. § 19:23-8. The number of signatures required for candidates seeking other state offices is even less: generally, candidates need collect only 100 signatures, and in some cases, 50 signatures is all that is required.5 See id. If the statutory requirements are met, candidates' names appear on the June primary election ballot, and if they are successful, their names are listed on the general election ballot.

Candidates not affiliated with one of the "political parties" -- which we will call alternative political party candidates -- must make use of the petition process. See generally N.J.S.A. § 19:13-3 to 13 (formally designating petition process as "[d]irect nominations by petition").6 Prior to the recent amendment, this route required alternative political party candidates, like the political party candidates, to file nominating petitions 54 days before the primary election. The amended version, however, allows alternative political party candidates to file nominating petitions by the date of the primary. See N.J.S.A. § 19:13-9. In other words, while political party candidates must file their nominating petitions in early April, alternative political party candidates are given an additional 54 days in which to file, and thus their nominating petitions are due in early June.

The other statutory requirements are generally the same as the ones applicable to political party candidates, but there are a few additional differences that require mention. First, alternative political party candidates may solicit signatures from all registered voters, regardless of their political affiliation. See N.J.S.A. § 19:13-5. Second, alternative political party gubernatorial candidates are required to gather only 800 signatures, whereas major party gubernatorial candidates, as previously noted, must

_____

5. Because there are two candidates elected for each Assembly district, candidates seeking this state office can file a"joint petition," and therefore such candidates need obtain only 50 signatures each.

6. None of the alternative political parties in this action received 10% of the electoral vote at the last general election, and therefore none is a recognized "political party." As a result, they may nominate candidates only

through the petition process. collect 1,000 signatures. Id. Last, upon meeting these requirements, alternative political party candidates bypass the primary election and proceed directly to the general election. Moreover, since New Jersey voters are always free to write in the name of the candidate of their choice, N.J.S.A. § 19:48-1(m), alternative political party candidates who are unable to have their names placed on the general election ballot through the statutory means discussed above may still participate in the election process as write- in candidates.

III.

At the outset, we reject plaintiffs' contention that this Court should remand the case to the District Court for an initial determination on whether the amended filing deadline violates plaintiffs' constitutional rights."The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 121 (1976); see also Roe v. Casey, 623 F.2d 829, 833 n.11 (3d Cir. 1980) (exercising discretion to review issue not raised below). The issue involved in this case concerns a pure question of law, and in the interest of avoiding further delay, we conclude that this case represents an appropriate instance for us to exercise our discretion and address the matter in this appeal.

Before addressing the merits of this case, we also consider plaintiffs' contention that the prior panel's decision, granting their request for preliminary injunctive relief, see Hooks, 121 F.3d 876, is the law of the case. The law of the case doctrine developed "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 3d § 4478 at 788 (1981) (hereinafter, "Wright & Miller"). Under this doctrine, an appeals court should generally decline to reconsider an issue that another panel has decided on a prior appeal in the same case. In re City of Philadelphia Litigation, 158 F.3d 711, 717 (3d Cir. 1998); see also 18 Wright & Miller, § 4478, at 788 (1981 & 1996 Supp.). We have recognized, however, that reconsideration is justified in extraordinary circumstances such as where: (1) there has been an intervening change in the law; (2) new evidence has become available; or (3) reconsideration is necessary to prevent clear error or a manifest injustice. In re City of Philadelphia Litigation, 158 F.3d at 718 (citing Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111,

116 (3d Cir. 1997)); see also 18 Wright & Miller, § 4478, at 790. Here, we are presented with an intervening change in the law, and thus we are not now bound by law- of- the-case principles to adhere to the prior panel's decision.

In addition, while the law of the case doctrine bars courts from reconsidering matters actually decided, it does not prohibit courts from revisiting matters that are"avowedly preliminary or tentative." See Wright & Miller, § 4478, at 798. As the Supreme Court has explained:

The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. University of Texas v. Camenisch, 451 U.S. 390, 395 (1981) (citations omitted) (emphasis added); see also New Jersey Hosp. Ass'n v. Waldman, 73 F.3d 509, 519 (3d Cir. 1995) (stating that findings of fact and conclusions of law made on preliminary injunction motions do not bar courts from making contrary findings or conclusions at a final hearing); Clark v. K-Mart Corp., 979 F.2d 965, 967-68 (3d Cir. 1992). And as we observed in United States v. Local 560 (I.B.T.), 974 F.2d 315, 330 (3d Cir. 1992): [A] trial court . . . is not bound by its decision or the appellate court's decision about preliminary relief. The burden of proof on a moving plaintiff is different on a motion for preliminary injunction. Additionally, a decision on a preliminary injunction is, in effect, only a prediction about the merits of the case.

Local 560, 974 F.2d at 330 (citing Board of Trade v. Commodity Futures Trading Comm'n, 605 F.2d 1016, 1020 (7th Cir. 1979), cert. denied, 446 U.S. 928 (1980)); accord Camenisch, 451 U.S. at 394 (explaining that there are "significant procedural differences between preliminary and permanent injunctions"); cf. ACLU of N.J. v. Black Horse Pike Reg. Bd. of Educ., 84 F.3d 1471, 1477 (3d Cir. 1996) (en banc) (holding that the District Court erred in concluding it was bound by the appellate court's preliminary ruling). A court's preliminary ruling, therefore, "neither constitutes nor substitutes for an actual finding that [the movant] ha[s] succeeded on the merits and [is] entitled to permanent relief." Id. at 1477.

Here, the prior panel did not hold that the plaintiffs were entitled to succeed; instead, it concluded that they were likely to succeed. Hence, law-of-the-case principles do not dictate our decision, and we accordingly proceed to consider the merits of the case.

IV.

A. Although "the rights of qualified voters to cast their votes effectively" and "the rights of individuals to associate for political purposes" are "of the most fundamental significance under our constitutional structure," Burdick v. Takushi, 504 U.S. 428, 433 (1992), they are not absolute. Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986). The Supreme Court has observed that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Timmons v. Twin Cities Area New Party, 520 U.S. 1364, 1369 (1997) (quoting Storer v. Brown , 415 U.S. 724, 730 (1974)). Therefore, states have broad power to enact election codes that comprehensively regulate the electoral process. Id. States must exercise this power, however, within the limits imposed by the First and Fourteenth Amendments.7 Williams v. Rhodes, 393 U.S. 23, 29 (1968).

Although ballot access statutes "inevitably affect[ ] -- at least to some degree -- the individual's right to vote and his right to associate with others for political ends," not all such restrictions are unconstitutional. Anderson , 460 U.S. at 788. Where the statute imposes only a minimal nondiscriminatory burden on minor parties, yet affords "reasonable access" to the ballot, it generally has been upheld. Burdick, 504 U.S. at 438 ("[W]e have repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls."); accord Anderson, 460 U.S. at 788 n.9 (noting that "generally applicable and evenhanded restrictions" ordinarily have been upheld).8 Conversely, election regulations have been invalidated where they "unfairly or unnecessarily burden[ ] the `availability of political opportunity.' " Anderson, 460 U.S. at 793 (quoting Clements v. Fashing, 457 U.S. 957, 964 (1982) (plurality opinion)). Under the Supreme Court's election jurisprudence, a state burdens the "availability of political opportunity" by enacting ballot access laws that unfairly discriminate

_____

7. As in Anderson, "we base our conclusions directly on the First and Fourteenth Amendments and do not

engage in a separate Equal Protection Clause analysis. We rely, however, on the analysis in a number of . . . prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment." 460 U.S. at 786–87 n.7.

8. See also Munro v. Socialist Workers Party, 479 U.S. 189 (1986) (upholding statute requiring parties to garner 1% of primary votes to obtain place on general election ballot); American Party of Texas v. White, 415 U.S. 767 (1974) (upholding statute requiring minor party candidates to file nominating petitions with signatures of 1% of the vote for governor at the last general election); Storer v. Brown, 415 U.S. 724 (1974) (upholding statute requiring independent candidates to be politically disaffiliated for at least one year before declaring candidacy, reasoning that the State's interests were sufficiently compelling); Rosario v. Rockefeller, 410 U.S. 752 (1973) (upholding statute requiring voters affiliated with one party to wait 11 months prior to voting for another party's candidate); Jenness v. Fortson, 403 U.S. 431 (1971) (upholding statute requiring minor party candidates to file nominating petitions signed by 5% of previous election's voters). against minor parties9 or "absolutely" or "directly preclude" minor parties from gaining a place on the ballot. 10 See Timmons, 520 U.S. at 1371 (upholding statute because it did not "exclude[ ] a particular group" from electoral participation, nor did it "directly preclude[ ] minor political parties from developing and organizing"); see also Williams, 393 U.S. at 25 (invalidating statute that made it "virtually impossible" for minor party candidates to gain access to the ballot).

The Supreme Court has recognized that "[c]onstitutional challenges to specific provisions of [a state's] election laws" cannot be resolved by any "litmus-paper test" and that there is "no substitute for the hard judgments that must be made." Storer, 415 U.S. at 730. Nonetheless, the Anderson Court developed a balancing test for use in determining whether a ballot access statute is unconstitutional:

[The Court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It must then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after

weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. Anderson, 460 U.S. at 789. Regulations imposing "severe" burdens must be narrowly tailored to serve a compelling state interest. Timmons, 520 U.S. at 1370. When the election regulation imposes a lesser burden, however, it need only be justified by important state regulatory interests. Id.; Burdick, 504 U.S. at 433 (requiring election regulations to survive strict scrutiny in every case"would

_____

9. Anderson, 460 U.S. 780; Williams v. Rhodes, 393 U.S. 23 (1968).

10. Norman v. Reed, 502 U.S. 279 (1992); Kusper v. Pontikes, 414 U.S. 51 (1973); Bullock v. Carter, 405 U.S. 134 (1972). tie the hands of States seeking to assure that elections are operated equitably and efficiently").

B. Before engaging in this balancing analysis, we must address the plaintiffs' argument that the outcome in this case is squarely governed by the Supreme Court's Anderson decision. While we agree that Anderson and its balancing test are relevant to our analysis, we do not believe that the outcome of that case controls our decision here. See Fishbeck v. Hechler, 85 F.3d 162 (4th Cir. 1996), cert. denied, 513 U.S. 1126 (1995); Hagelin for President Comm. of Kansas v. Graves, 25 F.3d 956 (10th Cir. 1994); see also Libertarian Party of Washington v. Munro, 31 F.3d 759, 762 (9th Cir. 1994); Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd., 844 F.2d 740, 746 n.9 (10th Cir. 1988); McLain v. Meier, 851 F.2d 1045 (8th Cir. 1988); Stevenson v. State Bd. of Elections, 794 F.2d 1176, 1181–82 (7th Cir. 1986). But see Hooks, 121 F.3d at 882 (concluding that Anderson governs constitutionality of prior version of statute).

In Anderson, the Supreme Court invalidated an Ohio election statute that required independent presidential candidates seeking a place on the November general election ballot to file a nominating petition with 5,000 signatures 75 days before the primary election. 460 U.S. at 808. In holding that the statute imposed an unconstitutional burden on independent candidates and their voters, the Supreme Court found two factors to be significant.

First, the Court stressed that the Ohio statute regulated presidential elections and not state or local elections. Anderson, 460 U.S. at 794. The Anderson Court explained that presidential selection procedures "implicate

a uniquely important national interest" because "the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." Id. at 794-95; see also Cousins v. Wigoda, 419 U.S. 477, 490 (1975) (announcing the principle that "the pervasive national interest in the selection of candidates for national office . . . is greater than any interest of an individual State"). The Court repeatedly emphasized that Ohio's statute interfered with a nationwide electoral process. See, e.g., Anderson, 460 U.S. at 790, 794-96, 804 & 806. Of particular significance, the Supreme Court declared that "the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." Id. at 795.

Second, the Court noted that the early filing deadline did not apply "equally" to all candidates and placed independent candidates at a relative disadvantage. Id. at 790-94. Independent candidates who failed to file by the early filing deadline (in 1980, by March 20) could not appear on the Ohio general election ballot, but the candidates selected by the major parties at their conventions in late summer, even if they had notfiled nominating petitions and had not participated in the Ohio primary, were guaranteed a spot on the general election ballot. Id. at 790-91. Thus, minor parties were locked into their selection of candidates by the early spring, whereas the major parties retained the flexibility to react to changing events by nominating candidates who did not emerge until months later. Id. at 790-91 n.11. In addition, the signature-gathering efforts of independent candidates were burdened by the early filing deadline. Id. at 792. Signatures had to be gathered when "the primary campaigns [were] far in the future," and therefore volunteers were difficult to recruit, and voters were disinterested. Id. Finding that this scheme"place[d] a particular burden on an indentifiable segment of Ohio's independent-minded voters," the Court stated:

A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and -- of particular importance -- against those voters whose political preferences lie outside the existing political parties. Id. at 792-94.

After finding that the early filing deadline severely burdened the independents' associational rights, the Court considered the State's articulated justifications: voter education, equal treatment, and political stability. Id. at

796. The Court noted that a State's interest in an informed and educated electorate is important and legitimate, but the Court concluded that, because of advances in communication technology, persons voting in the presidential election could receive sufficient information in less than five months. Id. at 796-97. The Court next rejected the "equal treatment" justification because, even though the statute required all parties to file a nominating petition if they intended to participate in the primary, the consequences of failing to do so were drastically different for independents and major parties. Id. at 799. Finally, the interest in "political stability" was rejected because Ohio's deadline was neither a "sore loser"11 nor a "disaffiliation"12 provision and was not precisely drawn to protect the parties from "intra-party feuding." Id. at 804-05, 804 n.31. The Court concluded that the State's proffered justifications were not narrowly tailored to advance compelling state interests and that these interests were outweighed by the "severe" burdens imposed on the independent presidential candidates. Id. at 806.

Although the statute in Anderson and the one challenged here undoubtedly possess certain similarities, there are also important factual differences. For one thing, the statute here applies to state and local elections, rather than the national presidential election, and therefore the State's interest is appreciably greater. In addition, the New Jersey statute does not impose a discriminatory burden on the alternative political party candidates; instead, it favors them by allowing them -- unlike the political party candidates -- an additional 54 days in which to gather signatures. Nor are the political party candidates given a preference,

_____

11. A "sore loser" candidacy is one in which an individual loses in a party primary and then seeks to run in the same election as an independent or minor party candidate. Anderson , 460 U.S. at 784 n.2.

12. A "disaffiliation" provision denies access to the ballot to any independent who had voted in a party primary or had been registered as a member of a political party within a specified period of time prior to the immediately preceding primary election. Storer v. Brown, 415 U.S. 726. bypass, or "political advantage."
The New Jersey scheme does not provide a mechanism by which a political party candidate who has failed to file a timely nominating petition may nevertheless appear on the general election ballot. Finally, the statute here requires far fewer signatures (100 signatures in most instances, as opposed to the 5,000 required in

Anderson) and imposes a significantly later filing deadline (the day of the primary, as opposed to 75 days before the primary in Anderson).

In light of these factual differences, we cannot mechanically adopt the outcome in that case. Instead, we look to Anderson for guidance, but assess the statute's validity in the context of the Supreme Court's election jurisprudence, including its most recent decision in Timmons, 520 U.S. 1364.

With this in mind, we turn now to the analysis of whether New Jersey's filing deadline imposes an unconstitutional burden on plaintiffs' constitutional rights. We begin by examining the burdens imposed on the plaintiffs, and then consider the State's justifications.

V.

The first step in the analysis prescribed by Anderson is to "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments . . . ." Anderson, 460 U.S. at 789. The rights in question are the right to vote, the right to associate for political purposes, and the right to the equal protection of the laws. Id. at 787. The plaintiffs argue that New Jersey's filing deadline (1) prevents them from reacting to events occurring after the filing deadline, and (2) is substantially more burdensome on them than on their political party counterparts and thus hinders their ability to obtain "political party" status. Appellees' Br. at 36. We conclude, however, that the burden imposed in this case, viewed in light of the Supreme Court's election jurisprudence, is minimal.

A. Plaintiffs argue that New Jersey's filing deadline burdens them by "prevent[ing] alternative political parties and their supporters from responding to disaffection with the candidates chosen by the recognized political parties at their June primaries." Appellees' Supplemental Br. at 2. Specifically, they assert that, like in Anderson, "voters dissatisfied with the primary results and desiring a broader candidate choice cannot work together to create such a choice." Id. (citing Hooks, 121 F.3d at 881 n.5).

Plaintiffs fail to recognize that, unlike in Anderson, they are able to respond to the events taking place in the political landscape during the 54-day interval between the political party and the alternative political party deadlines. Therefore, what the plaintiffs wish to enjoy on a permanent basis -- and what they obtained in 1998 under the interim consent order -- is a petition deadline that is substantially later than the date of the

primary, when the major party candidates are nominated. (In 1998, their deadline was July 27.) Accordingly, what they are seeking cannot be termed equal treatment. On the contrary, they are asserting a constitutional right to preferential treatment.

Anderson does not support this argument. In that case, independent candidate John Anderson's petition, although filed after Ohio's filing deadline, was submitted well before the major party candidates were chosen, and while the Court held that Ohio could not constitutionally reject his petition, the Court never suggested that Ohio was constitutionally precluded from imposing any deadline prior to the conclusion of the major party convention.

The Supreme Court has recognized that "some cut off period is necessary," American, 415 U.S. at 787 n.18, and accordingly it has approved of state statutes that require minor party candidates to file their petitions around the time of the primary election. For instance, in Jenness, 403 U.S. at 433–34, the election law required independent candidates to submit nominating petitions signed byfive percent of the voters in the previous election by the second Wednesday in June preceding the November general election. See also American Party, 415 U.S. at 787 n.18 (stating that "the 120–day pre-election filing deadline is neither unreasonable nor unduly burdensome"); Burdick, 504 U.S. at 437 (giving little weight to a candidate's interest in "making a later rather than an early decision to seek . . . ballot status") (citing Storer, 415 U.S. at 736 (requiring candidates to be politically disaffiliated for at least one year prior to the primary in which they seek participation)). Although the Court's holding addressed only whether the signature requirements imposed an impermissible burden, the Court nonetheless declared that Georgia had not"fix[ed] an unreasonably early filing deadline for candidates not endorsed by established parties." Id. at 438.13 Finding the Supreme Court's comment in Jenness relevant, we fail to see how plaintiffs can claim they are entitled to an even later filing deadline than New Jersey has already provided.

Nor do we see any support in any other Supreme Court decision for the plaintiffs' claim of right to preferential treatment. Rather, the Supreme Court's election jurisprudence suggests that no candidates should be given any relative advantage over the other. See Timmons, 520 U.S. at 1374; Munro, 479 U.S. at 198.

Timmons provides an apt illustration. There, the Supreme Court upheld Minnesota's ban on fusion, "the

electoral support of a single set of candidates by two or more parties." 520 U.S. at 1367 n.1. In doing so, the Court rejected the petitioners' argument that without fusion minor political parties could not survive. Id. at 1371. "The supposed benefits of fusion to minor parties," the Court wrote, "does not require that [the State] permit it." Id. Although minor parties face many hurdles in entering the political arena, the Court explained that states are under no duty to alleviate those difficulties. Id. Indeed, states have broad power to enact reasonable election codes that "may, in practice, favor the traditional two-party system."14 Id. at

_____

13. Moreover, two circuits have upheld similar filing deadlines, see, e.g., Fishbeck v. Hechler, 85 F.3d 162 (4th Cir. 1996) (finding primary-eve filing deadline constitutional); Hagelin for President Comm. of Kansas v. Graves, 25 F.3d 956 (10th Cir. 1994) (same), cert. denied, 513 U.S. 1126 (1995), and four circuits have upheld filing deadlines imposing substantially earlier deadlines, see, e.g., Libertarian Party of Washington v. Munro, 31 F.3d 759 (9th Cir. 1994); Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd., 844 F.2d 740 (10th Cir. 1988); McLain v. Meier, 851 F.2d 1045 (8th Cir. 1988); Stevenson v. State Bd. of Elections, 794 F.2d 1176 (7th Cir. 1986).

14. Plaintiffs argue that Timmons is not relevant to the present matter because it is a voters' rights -- not ballot access -- case. The Supreme 1374; see also Munro, 479 U.S. at 198 ("States are not burdened with a constitutional imperative to reduce voter apathy or to `handicap' an unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot.").

Here, any burden imposed does not fall unequally upon the alternative political party candidates. See American Party of Texas v. White, 415 U.S. 767, 784 n.16 (1974) ("It is sufficient to note that the system does not create or promote a substantial imbalance in the relative difficulty of each group to qualify for the ballot."); id. at 788 (upholding statute and noting that it provided an "essentially equal opportunity" for ballot access). Rather, the current version of the statute (unlike its predecessor) allows all parties to select their candidates on the same date and favors alternative political party candidates by allowing them an additional 54 days in which to file their nominating petitions. If any candidate fails to file a nominating petition by the requisite deadline, he or she is absolutely denied access to the general election ballot, regardless of his or her

political affiliation. Cf. Anderson, 460 U.S. at 790-91 & n.11. To order the relief that plaintiffs request would tip the scales in their favor and provide them with a relative advantage over their political party counterparts. We therefore reject the plaintiffs' claim that they are constitutionally entitled to file their nominating petitions after the major party candidates are chosen so that they can recruit and nominate candidates who can capitalize on disaffection with the major political parties' nominees.

B. Plaintiffs further argue that because of their limited resources and small staffs, the statutory requirements are substantially more burdensome on them than on their political party counterparts and thus hinders their ability to achieve "political party" status. Appellees' Br. at 29; see also Hooks, 121 F.3d at 880-81. They report that "no group other than Democrats and Republicans has qualified as `a

_____

Court, however, has cautioned that "the rights of voters and the rights of candidates do not lend themselves to neat separation." Burdick, 504 U.S. at 438. Thus, in this context, there is no significant distinction between the two. [political] party' in New Jersey since at least 1913." Appellees' Br. at 29. We reject this argument for several reasons.

First, any connection between the filing deadline-- the feature of the New Jersey scheme that is at issue here -- and the difficulty of achieving "political party" (i.e., major party) status is extremely speculative. As will be discussed below, New Jersey's former filing deadline -- which provided alternative political party candidates fewer days in which to gather signatures than the amended version-- did not prevent scores of alternative party and independent candidates from securing spots on the general election ballot. Therefore, the plaintiffs' theory must be that the alternative parties would fare much better in the general election (and might obtain 10% of the vote) if they could select their candidates after the major party candidates are chosen, but this theory is entirely unproven and seems doubtful.

Second, even if such an effect could be shown, as discussed above, Munro and Timmons make clear that the Constitution does not impose an affirmative duty upon the states to give minor parties preferential treatment. Timmons, 520 U.S. at 1374 (commenting that states may enact regulations which, "in practice, favor the traditional two-party system"); Munro, 479 U.S. at 198 (emphasizing that states are not "burdened

with the constitutional imperative . . . to `handicap' an unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot").

Third, the Supreme Court has refused to recognize a statute's incidental effect on a minor party's future viability as justification for overturning an otherwise reasonable, nondiscriminatory regulation. Timmons, 520 U.S. at 1371 (upholding statute prohibiting fusion despite plaintiffs' argument that without fusion minor parties could not enhance their electoral viability). For instance, in Munro, 32 minor party candidates appeared on the primary ballot. Munro, 479 U.S. at 192. The State then enacted a law requiring candidates to procure one percent of the primary votes in the preceding election in order to be placed on the general election ballot. Id. at 196–97. After that change, only one minor party appeared on the general election ballot, but the Court sustained the restriction, implicitly recognizing that a state's interest in protecting the integrity of its electoral process may outweigh a minor party's interest in ballot access. Id.; cf. Democratic Party v. Wisconsin, 450 U.S. 107, 126 (1974) (finding unconstitutional a statute that enhanced minor party viability through broader electoral participation in the selection of officials).

Last, the Supreme Court has upheld signature requirements that are substantially more onerous. The Court has repeatedly recognized that "States may condition access to the general election ballot by a minor party or independent candidate upon a showing of a modicum of support among the potential voters for the office." Munro, 479 U.S. at 193; see also American Party v. White, 415 U.S. 767 (1974) (upholding statute requiring minor parties to obtain approximately 400 signatures per day within a 55– day period); Jenness v. Fortson, 403 U.S. 431 (1971) (upholding Georgia's law requiring minor parties tofile a nominating petition signed by voters equaling 5% of the votes cast at the prior election within a 180–day period).

New Jersey's filing deadline is vastly different from that found unconstitutionally burdensome in Anderson , and even more reasonable than those upheld in Jenness and American. For one thing, the burden of gathering signatures falls upon all candidates equally. Alternative political party candidates, unlike the political party candidates, are given an additional 54 days in which to gather signatures. Nominating petitions are due in early June, during the height of the primary campaign when voters are interested and volunteers are willing

to participate. Candidates must gather a minimal number of signatures, they can be solicited from voters of any affiliation, and candidates have an unlimited amount of time in which to gather signatures. Further, candidates unable to satisfy these requirements are afforded the opportunity to appear on the ballot through the write-in process.15

_____

15. Though we recognize that constitutional infirmity cannot be cured by the availability of a write-in process, Anderson, 460 U.S. at 799 n.26, we nonetheless believe that permitting write-in voting allows alternative political party candidates and their supporters additional opportunities for participating in the general election ballot. See Hooks, 121 F.3d at 885 (Scirica, J., dissenting). That New Jersey's statutory requirements impose only a minimal burden is made clear when one considers the plethora of candidates who qualified for the general election ballot under the former statutory scheme, which imposed an earlier filing deadline than the one at issue here. American Party, 415 U.S. at 787 (discounting argument that burden imposed by state is onerous, because"two of the original party plaintiffs themselves satisfied the[ ] requirements"); Munro, 479 U.S. at 197 n.11 (stating that Washington's statute imposed an "insubstantial obstacle" on minor party candidates because many such candidates had qualified for the ballot); see Storer, 415 U.S. at 742 (stating that the appropriate question is whether under the statutory scheme a "reasonably diligent" minor party candidate could gain a place on the State's general election ballot); cf. Anderson, 460 U.S. at 791-92 n.12. In 1997, the State held elections for the governorship, the State senate, and the general assembly. Despite the early filing deadline, more than 100 alternative political party candidates appeared on the general election ballot after obtaining the requisite number of signatures and filing a nominating petition on the filing deadline. Of these candidates, eight filed petitions for the office of Governor, 25filed for the State senate, and 68 filed for the general assembly. Indeed, five of the individual alternative political party candidates in this action -- representing four of the five alternative political party plaintiffs -- were successful in obtaining a place on that year's general election ballot. In previous election years, the number of alternative political party candidates appearing on the general election ballot for statewide and local office was equally numerous: from 1993 through 1996, 231 alternative political party candidates were able to satisfy the statutory requirements and secure a place on the general election ballot.16 In other words,

the empirical evidence demonstrates that, in fact, diligent alternative political party candidates were not hindered in their ability to satisfy the statutory requirements and

_____

16. Specifically, in 1993, 66 alternative political party candidates appeared on the general election ballot; in 1994, 33 appeared on the ballot; in 1995, 82 appeared on the ballot; and in 1996, 50 appeared on the ballot. obtain a place on the general election ballot. As the amended version provides alternative political party candidates an additional 54 days in which to file their nominating petitions, it seems likely that a substantial number of alternative political party candidates will continue to gain access to the general election ballot.

In sum, we conclude that New Jersey's filing deadline does not unfairly discriminate against the plaintiffs and does not "absolutely" or "directly preclude" them from gaining access to the ballot. Rather, the deadline is a reasonable, nondiscriminatory regulation that imposes at most a minimal burden on plaintiffs' rights.

VI.

The next step in our analysis is to identify and evaluate the State's asserted interests in support of itsfiling deadline. The State identifies three such interests: encouraging political stability, promoting a fair electoral process, and ensuring an informed electorate. Because the burden is not severe, the State need not proffer a narrowly– tailored regulation that advances a compelling state interest. Instead, important regulatory interests provide a sufficient justification.

We reject at the outset plaintiffs' argument taking the State to task for repeatedly referring to its interests as "weighty" but failing to elucidate, through empirical evidence, exactly how its interests are promoted by the filing deadline. In Munro, the Court reaffirmed the principle that it has "never required a State to make a particularized showing of the existence of [its articulated interests] prior to the imposition of reasonable restrictions on ballot access." 479 U.S. at 194–95. The Court further explained:

To require States to prove [its articulated interests] . . . as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political

system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively . . . .

Id. at 195-96. Thus, the State was not required to proffer empirical evidence in support of its articulated interests.

A. New Jersey has a strong interest in treating all candidates equally. See Hooks, 121 F.3d at 885 (Scirica, J., dissenting). The filing deadline provides all candidates with the same amount of time to win the nomination from their respective parties, and it subjects all candidates participating in the general election to voter assessment for the same period of time. See Senate State Gov't, Banking & Financial Instits. Comm., Statement to Senate, No. 1227, State of New Jersey (June 25, 1998), at 3 (stating that the filing deadline "simultaneously identif[ies] all candidates for a political office, both party-affiliated and independent, placing them on equal footing before the electorate"). Allowing minor parties to file on a later date-- after the major party's primary -- would give them a significant advantage, and it is entirely reasonable for New Jersey to regard any such advantage as unfair. Because the Constitution does not impose an affirmative duty upon the states to "handicap" alternative political party candidates in order to facilitate their access to the ballot, see Munro, 479 U.S. at 198, it was entirely proper for the State to enact legislation that ensures that such a result does not occur. We therefore find that the State has proffered an important regulatory interest in ensuring a fair electoral process.

Plaintiffs argue that the primary-day deadline "cannot be justified as serving an interest in equal treatment," because "alternative political parties are not permitted to hold primaries," and "[o]n primary day, major party candidates do not file anything." Appellees' Supplemental Br. at 3. However, New Jersey's creation of two separate procedural mechanisms for gaining access to the ballot does not necessarily mean that candidates are treated unequally; nor is this scheme inherently impermissible, provided the procedures impose no undue burden on minor political parties. American Party, 415 U.S. at 781-82 (stating that the "procedures [may be] different," but the Constitution "does not necessarily forbid the one in preference to the other"); Jenness, 403 U.S. at 441 (explaining that states may establish alternative paths to the ballot, "neither of which can be assumed to be inherently more burdensome than the other"). As the Supreme Court has explained:

[T]here are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. [A State is not] guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot.

Jenness, 403 U.S. at 441–42; id. at 442 (declaring that "sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike"). Therefore, it is entirely reasonable for New Jersey to allow alternative political party candidates to gain access to the ballot by way of the petition process, while at the same time requiring political party candidates to participate in the primary election. See Jenness, 403 U.S. at 442 (upholding scheme that required major parties to participate in primary, while allowing minor parties to gain access through petition process); American Party, 415 U.S. at 781– 82 (upholding scheme that required major party to participate in primary and minor party candidates to participate by way of convention). Indeed, this statutory scheme, if anything, places a heavier burden on the political party candidates: Not only must they collect the requisite number of signatures, but they must also participate in –– and win –– the primary election in order to gain a place on the general election ballot. Alternative political party candidates, on the other hand, can focus their resources and time during the April to June interval on gathering signatures rather than preparing for the primary, and if they gather the requisite number of signatures, they are automatically listed on the general election ballot. Jenness, 403 U.S. at 440 ("Surely an argument could as well be made on behalf of [losing primary candidates] that it is they who were denied equal protection vis-a-vis a candidate who could have had his [or her] name printed on the ballot simply by filing a nominating petition signed by 5% of the total electorate."). We therefore reject plaintiffs' argument, and find that New Jersey has advanced a legitimate interest in providing an essentially equal ballot access mechanism.

B. The State also asserts a legitimate interest in voter education. Anderson, 460 U.S. at 796 ("There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election."). New Jersey's filing deadline is designed to allow primary voters to identify and evaluate all candidates in advance of casting their votes at the primary election. Because the

deadline "guarantees that primary voters, when selecting candidates, have at least some knowledge of the political terrain they are approaching," Cromer, 917 F.2d 819, 832 (4th Cir. 1990) (Wilkinson, J., dissenting), and insures that they cast an informed and "educated expression[ ] of popular will," Anderson, 460 U.S. at 796, the State's interest is important and legitimate.17

C. Last, the State correctly notes that it has a legitimate interest in limiting frivolous candidacies and maintaining a stable and efficient election process. Anderson, 460 U.S. at 803; Storer, 415 U.S. at 736. See The Federalist, No. 10 (James Madison) (explaining that splintered parties and unrestrained factionalism may do significant damage to a state's political structure). By requiring all candidates to demonstrate a modicum of support before gaining access to the ballot, the filing deadline serves important State interests "in avoiding confusion, deception, and even frustration of the democratic process at the general election." Jenness, 403 U.S. at 442; see also Burdick, 504 U.S. at 432–36.

_____

17. Plaintiffs contend that the State's interest in voter education should not be considered by the Court because it was not articulated by the State but by Judge Scirica in the prior appeal. Wefind this argument unpersuasive. First, in Timmons, the Court recognized, sua sponte, that fusion bans serve the State's interest in maintaining a stable two-party system, 520 U.S. at 1374, and second, the State raised this interest before amendment of the statute. Therefore, the State's interest in voter education is properly before us. Cf. Reform Party of Allegheny, 1999 WL 171326, at *39–41 n.11 (refusing to hear state interest raised for first time at oral argument). In addition, by requiring alternative political party candidates to file nominating petitions before the results of the primary are available, New Jersey's filing deadline serves the State's interest in preventing "sore loser" candidacies. A "sore loser" candidacy is one in which an individual loses in a party primary and then seeks to run in the same election as an independent or minor party candidate. In Anderson, the Court found that Ohio's asserted interest in preventing "sore loser" candidacies did not survive strict scrutiny because the Ohio statute was really "not a `sore loser' statute," 460 U.S. at 804 n.31, and because the statute was not precisely drawn to effectuate Ohio's alleged aims. Id. at 804–05 & n.31.

We agree that here, as in Anderson, the State's interest in preventing "sore loser" candidacies is not narrowly tailored to effectuate a compelling state interest. We also recognize that New Jersey has a disaffiliation

provision that arguably prevents "sore loser" candidacies.18 Nonetheless, we find that New Jersey's interest in preventing "sore losers" rises to the level of a legitimate and important State interest. Cf. Reform Party of Allegheny County v. Allegheny County Dep't of Elections, Nos. 97–3359, 96–3677, 1999 WL 171326, at *10–11 (3d Cir. Mar. 30, 1999) (en banc) (finding state's interest in preventing sore loser candidacies insufficient to satisfy heightened scrutiny).

Finally, we reject plaintiffs' contention that New Jersey's filing deadline is unconstitutional because it cannot be _____

18. That statute provides, in relevant part:

No petition for direct nomination, including a petition filed pursuant to R.S. 19:13–19, which, for any reason, is filed after the deadline established in R.S. 19:13–9 shall nominate to any elective public office a candidate who unsuccessfully sought the nomination of a political party to that office in the primary election held in the same calendar year and no unsuccessful primary candidate shall sign an acceptance of such a petition for direct nomination .

N.J.S.A. § 19:13–8.1 (emphasis added). This provision prevents "sore loser" candidacies, as that term has been defined. Even if the deadline for alternative political parties were to take place after the June primary, unsuccessful primary candidates would not be able tofile a nominating petition to run as a candidate for an alternative political party. justified based on administrative need. Contrary to plaintiffs' suggestion, an administrative justification is not a sine qua non of the constitutionality of election regulations. Where, as here, the statute is justified by important and legitimate interests such as political stability, a fair electoral process, and voter education, those interests alone are sufficient.

VII.

In conclusion, we hold that the State's interests in a fair electoral process, voter education, and political stability are sufficient to outweigh the small burden imposed upon the plaintiffs' rights under the First and Fourteenth Amendments. Because we conclude that New Jersey'sfiling deadline is a reasonable, nondiscriminatory regulation and is justified by New Jersey's important regulatory interests, we reverse the decision of the District Court.


A True Copy: Teste:

Clerk of the United States Court of Appeals for the Third Circuit