In re **INTEGRATED HEALTH SERVICES, INC., et al.,** Debtors.

**FSQ, Inc., f/k/a Five Star Quality Care, Inc., et al., Plaintiffs,**

v.

**Integrated Health Services, Inc., et al., Defendants.**

**Bankruptcy No. 00–00389.**
**Adversary No. 02–05193.**

United States Bankruptcy Court, D. Delaware.

Jan. 9, 2007.

Jeremy W. Ryan, Mark Minuti, Saul Ewing LLP, Wilmington, DE, Tara L. Lattomus, Eckert Seamans Cherin & Mellot, LLC, Wilmington, DE, for FSQ, Inc.

Alfred Villoch, III, Buchanan Ingersoll PC, Wilmington, DE, Edmon L. Morton, James L. Patton, Joseph M. Barry, Kenneth J. Enos, Robert S. Brady*, Young, Conaway, Stargatt & Taylor,Wilmington, DE, for Integrated Health Services, Inc.

Matthew J. Troy, U.S. Department of Justice, Civil Division, Washington, DC, U.S. Dept. of Health and Human Services.

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court are cross motions for summary judgment. For the reasons stated below, the Court will deny the motion of FSQ, Inc. ("FSQ") and grant the motion of IHS Liquidating LLC and its related entities (collectively "IHS").

## I. *BACKGROUND*

On February 2, 2000, Integrated Health Services, Inc., IHS Licensees, and CCA of Midwest, Inc. (collectively "the Debtors")

---

\* Counsel is to distribute a copy of this Opinion and Order on all interested parties and file a Certificate of Service with the Court.

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

and several of their affiliates filed voluntary petitions under chapter 11 of the Bankruptcy Code. On or about April 12, 2000, the Debtors filed a Motion for approval of a settlement agreement with Senior Housing Properties Trust, the predecessor to FSQ ("the FSQ Settlement"). The FSQ Settlement provided for the transfer of leasehold and security interests in certain health care facilities ("the Transfer Facilities") from the Debtors to FSQ and its licensees.

The United States, acting on behalf of the Department of Health and Human Services, filed an objection to the FSQ Settlement, asserting that the Debtors could not convey their interests in the Transfer Facilities while continuing to bill under their medicare provider agreements. The objection was resolved through a stipulation ("the Stipulation") which provided for an orderly transfer of the Debtors' medicare provider agreements to FSQ, once it obtained licenses. FSQ agreed to pay the United States $10,000 per facility to cure all existing financial defaults under the Debtors' provider agreements. The United States waived any other claims it had against the Debtors with respect to the Transfer Facilities, except claims under the False Claims Act. With the objection of the United States resolved, the FSQ Settlement was approved by Order dated July 7, 2000. The transaction closed effective July 1, 2000.

Pursuant to the FSQ Settlement, the Debtors entered into an agreement (the "Management Agreement") with FSQ dated July 10, 2000. Under the Management Agreement, FSQ agreed to manage the facilities and the Debtors agreed to bill for those services under the Debtors' provider agreements and to pay FSQ all receipts for the facilities' operations between the transaction closing date and the time FSQ obtained licenses to operate those facilities ("the Transition Period"). The Management Agreement specifically provided that any monies received by the Debtors for Medicare-covered services performed at the Transfer Facilities during the Transition Period would be forwarded by the Debtors to FSQ.

FSQ obtained licenses at the Transfer Facilities at various times between October 1, 2000, and April 2, 2001. On October 10, 2001, FSQ and the Debtors executed a letter agreement ("the Letter Agreement") regarding the final reconciliation of various claims between FSQ and the Debtors arising under the FSQ Settlement. At that time, the parties agreed that the Debtors owed FSQ $1.45 million, plus any amounts due for reconciliation of the periodic interim payments made by the United States (the "PIP Receivable").

On February 5, 2003, the Debtors filed a Disclosure Statement relating to their Joint Plan of Reorganization ("the Disclosure Statement"). The Disclosure Statement outlined an additional settlement ("the U.S. Agreement") resolving disputes between the Debtors and the United States relating to many of the Debtors' facilities and relating to claims for (1) alleged violations of Medicare regulations and the False Claims Act in the approximate amount of $41 million, subject to treble damages (the "False Claims") and (2) $140 million in contractual indebtedness arising from the Debtors' purchase of First American Health Care of Georgia, Inc. Pursuant to the U.S. Agreement, the United States was to receive a payment of $19.1 million for claims arising under the False Claims Act, a portion of which ($17.1 million) was to be set off against underpayments due by the United States to the Debtors for various facilities. The U.S. Agreement was approved on February 13, 2002, pursuant to the Order confirming the Debtors' Plan of Reorganization. The Plan

also provided for the transfer of substantially all the Debtors' remaining facilities to Abe Briarwood Corporation and/or its designee. With the approval of the Plan, the Debtors were left with few remaining liquid assets.

On March 17, 2003, FSQ filed a Complaint against the Debtors contending that the Debtors owe FSQ for services rendered at the Transfer Facilities during the Transition Period. The Complaint was amended on March 17, 2003, to add the United States as a defendant. In the Amended Complaint FSQ asserted that the United States refused to pay the PIP Receivable because it was offset against the False Claims pursuant to the U.S. Agreement. FSQ seeks enforcement of the Settlement Agreement, Management Agreement and the Letter Agreement which provide that the Debtors are to remit to FSQ payments for services rendered at the Transfer Facilities during the Transition Period. FSQ specifically asserts it is entitled to be paid $1,268,762 for the PIP Receivable.

On April 21, 2003, the United States filed a Motion to Dismiss the Counts of the Amended Complaint pertaining to it pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure, made applicable by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. That Motion was granted by Order and Memorandum Opinion dated December 30, 2003. In that Opinion the Court concluded that the tort claims asserted against the United States were precluded by the doctrine of sovereign immunity and the Federal Tort Claims Act. The Court further held that the United States had not breached the Stipulation by entering into the U.S. Agreement because the Stipulation expressly preserved and did not waive the False Claims.

On May 19, 2003, the Debtors filed a Motion to Dismiss the Amended Complaint pursuant to Rule 12(b)(6). That Motion was denied by Amended Opinion and Order dated March 23, 2004, because the Court concluded that there were material issues of disputed fact regarding whether the Letter Agreement precluded FSQ from asserting a claim against the Debtors for the PIP Receivable.

Subsequently, on June 17, 2005, FSQ filed a Motion for Summary Judgment. IHS responded with a Cross Motion for Summary Judgment. With the filing of FSQ's Further Reply on July 31, 2006, the cross motions are fully briefed and ripe for decision.

## II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (E) & (O).

## III. DISCUSSION

FSQ asserts that it is entitled to the PIP Receivable as it arose during the Transition Period when FSQ was operating the facilities pursuant to the Management Agreement. It asserts that the United States is refusing to pay the PIP Receivable because it had the right to offset that sum against the False Claims under the U.S. Agreement. FSQ alleges that as a result of the United States' refusal to pay, it has a claim against the Debtors.

IHS disputes FSQ's assertions. It argues that the United States did not offset the PIP Receivable against the False Claims pursuant to the U.S. Agreement. Instead, IHS asserts that the United States is refusing to pay the PIP Receivable because it is not due according to the express terms of the Stipulation. As a result, IHS asserts that FSQ has no claim against the United States or the Debtors' estate.

## A. Law of the Case

As a preliminary matter, FSQ asserts that IHS's argument is precluded by the doctrine of the law of the case because in denying the United States' motion to dismiss, the Court found that the United States had, in fact, offset the PIP Receivable against the False Claims in accordance with the U.S. Agreement. The doctrine of the law of the case provides that when a court decides a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case. *In re Continental Airlines, Inc.*, 279 F.3d 226, 232–33 (3d Cir.2002). This rule promotes the finality and efficiency of the judicial process by "protecting against the agitation of settled issues." *Id.* at 233 *(quoting Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)).

IHS argues, however, that the doctrine of the law of the case is not available, when the prior decision was in the context of a motion to dismiss. *See, e.g., McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir.2000) (concluding that "our holding on a motion to dismiss does not establish the law of the case for purposes of summary judgment"); *Perez–Ruiz v. Crespo–Guillen*, 25 F.3d 40, 42 (1st Cir.1994) (concluding that "[i]nterlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case."). *See also Council of Alternative Political Parties v. Hooks*, 179 F.3d 64, 69–70 (3d Cir.1999) (holding that "while the law of the case doctrine bars courts from reconsidering matters actually decided, it does not prohibit courts from revisiting matters that are 'avowedly preliminary or tentative'" and, therefore, court was free to determine the merits of the case despite the issuance of a preliminary injunction).

In considering a motion to dismiss under Rule 12(b)(6), a court is required to accept all factual assertions in the light most favorable to the non-moving party. *See, e.g., Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989). In the decision on the Motions to Dismiss in this case, therefore, the Court accepted the allegations of FSQ that the United States had offset the PIP Receivable against the False Claims pursuant to the U.S. Agreement. Nonetheless, the Court concluded that the United States had not violated the Stipulation by entering into the U.S. Agreement, because paragraph 11 of the Stipulation specifically provided that "[t]his Stipulation is not intended to constitute a release, waiver or compromise of any claims against [the Debtors] under the False Claims Act."

The effect of the decisions on the Motions to Dismiss cannot, however, constitute law of the case and require that the Court grant FSQ's Motion for Summary Judgment. Unlike a motion to dismiss, a motion for summary judgment is entitled to no presumption that the facts as alleged are true. Rather in prosecuting a motion for summary judgment, the moving party must present admissible evidence to "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995).

Consequently, the Court concludes that the doctrine of law of the case is not applicable and does not mandate a decision in FSQ's favor. *See, e.g., McKenzie*, 219 F.3d at 513; *Council of Alternative Political Parties*, 179 F.3d at 69–70; *Perez–*

*Ruiz,* 25 F.3d at 42. Rather, the Court must consider the evidence presented, including all of the agreements governing the parties' relationship, to determine whether FSQ is entitled to a claim against the Debtors' estates for the PIP Receivable.

### B. *Merits of the Case*

1. *Section 2.8(c) of the Management Agreement*

 FSQ's summary judgment motion is premised on its assertion of a claim against the Debtors' estate pursuant to section 2.8(c) of the Management Agreement. Section 2.8(c) provides in pertinent part that:

If and to the extent that there shall be a reduction (a *"Reduction"*) in the amount to be paid on any account receivable due to [the Debtors] by a Medicaid program or the Medicare program for services rendered at any Facility from and after the Effective Time (an *"IHS Government Receivable"*) by reason of any withholding, freeze, restriction, offset or recoupment applied against such IHS Government Receivable for an amount payable by any [Debtor] to the applicable Third Party Payor ... with respect to services provided on or prior to the Effective Time (a *"Pre–Effective Date Third Party Payor Claim"*), then [FSQ] shall have a claim against the [Debtors] (a *"Reduction Claim"*) that is: (1) in the amount of the Reduction; and (2) of equal priority to the priority that would have been accorded to the Pre–Effective Date Third Party Payor Claim in the [Debtors'] bankruptcies....

(Management Agreement § 2.8(c) (emphasis in original)).

IHS argues, however, that there is no evidence that the United States offset the PIP Receivable against the False Claims as part of the U.S. Agreement. In fact, IHS presented affidavits evidencing that the PIP Receivable was not part of the $17.1 million which was set off against the False Claims.

The Court rejects IHS's argument, however, because the U.S. Agreement itself evidences that there was not a setoff of specific accounts against the False Claims. Rather the U.S. Agreement was a settlement and waiver of all claims that the United States had against the Debtors and vice versa except for claims of $19.1 million and $17.1 million which the parties agreed would be allowed for purposes of setoff only. There was no delineation of what specific claims the Debtors had against the United States which were being allowed for purposes of the setoff. Therefore, the evidence presented is not sufficient to establish that the PIP receivable was not part of the setoff or otherwise released by virtue of the U.S. Agreement.

2. *Letter Agreement*

IHS asserts that the Letter Agreement modified the Management Agreement and precludes FSQ from asserting any claim for the PIP Receivable. The Letter Agreement provides in relevant part:

(1) ... Except for such payments discussed below, the payment of $1,450,000 shall constitute a full and final reconciliation of all Medicare and Medicaid funds previously received, or that may be received in the future, by [FSQ] or [the Debtors] under the [FSQ Settlement].

(2) ... [The Debtors] will deliver that portion of any [PIP Payment] attributable to the last six months of calendar year 2000 to [FSQ], without counterclaim or set off, immediately upon its receipt....

(Letter Agreement ¶s 1 & 2).

IHS contends that under the terms of the Letter Agreement, the Debtors had no

obligation to pay FSQ the PIP Receivable unless and until they *received* payment for it. Because the United States has not paid the PIP Receivable, IHS asserts that nothing is due to FSQ from IHS.

The Court disagrees. The Letter Agreement does resolve all the disputes between the parties except for the PIP Receivable. The Letter Agreement then states the affirmative duty of the Debtor to deliver any PIP Payment received by it without any right of setoff. It does not otherwise waive any rights that FSQ has to recover the PIP Receivable that may arise under the Management Agreement itself. Therefore, FSQ's argument that it has the right to a claim against the Debtors' estate under section 2.8(c) of the Management Agreement is not precluded by the Letter Agreement.

### 3. *Stipulation*

IHS argues further, however, that FSQ has no claim for the PIP Receivable because it was released by virtue of the language of the Stipulation itself. Specifically, IHS points to paragraph 3 of the Stipulation which states in relevant part:

> ... notwithstanding the assumption and assignment of a Medicare Provider Agreement, *any claim* of Medicare, the applicable fiscal intermediary, or HHS against any Debtor relating to or arising under such assumed and assigned Medicare Provider Agreement *arising prior to the Effective Date is cured and released and each of the IHS Entities and [the United States] waive their respective rights to assert the right to further payments from the other, as the case may be, for underpayments or overpayments* relating thereto; and *[FSQ], IHS and [the United States] each will consider all cost reporting periods under each Medicare Provider Agreement prior to the Effective Date to be fully and*

> *finally closed* in accordance with all applicable laws....

(Stipulation at ¶ 3 (emphasis added).) The Stipulation defined the Effective Date to be the date that FSQ obtained a license to operate the facilities. (*Id.* at ¶ 1.)

In fact, this is the position that the United States has taken with the Debtors and in this adversary proceeding: that the Stipulation itself provided that, once FSQ obtained a license for the facilities, the parties would have no claims against each other for any period prior to that date. (*See* Defendant United States of America's Memorandum in Support of Motion to Dismiss at 7–8.)

The Court agrees with IHS. The Stipulation itself provided that, once the Effective Date occurred, the slate would be clean. The United States would have no claims for overpayments made before that date, and IHS and FSQ would have no claims for any under-payments made before that date.

This conclusion is consistent with section 2.8(c) of the Management Agreement. That section provides that FSQ would have a claim against the Debtors' estate if the United States offset a claim for overpayments made *before* the Effective Date against sums due FSQ for services rendered *after* the Effective Date. The PIP Receivable is not for any services rendered by FSQ after the Effective Date; it is for services rendered during the Transition Period before the Effective Date.

This conclusion is also not inconsistent with the Letter Agreement under which the Debtors were obligated to pay FSQ only if they received payment of the PIP Receivable from the United States. They did not.

Consequently, the Court concludes that under the parties' agreements, there is nothing due to FSQ from the Debtors'

estate for the PIP Receivable. Summary judgment in favor of IHS is warranted.

## IV. *CONCLUSION*

For the foregoing reasons the Court will deny the Motion of FSQ for summary judgment and grant the Motion of IHS for summary judgment.

An appropriate Order is attached.

### *ORDER*

**AND NOW,** this **9th** day of **JANUARY, 2007,** upon consideration of the Cross Motions for Summary Judgment filed by FSQ, Inc., and IHS Liquidating LLC and for the reasons stated in the attached Opinion, it is hereby

**ORDERED** that the Motion of FSQ, Inc., for Summary Judgment is **DENIED;** and it is further

**ORDERED** that the Motion of IHS Liquidating LLC for Summary Judgment is **GRANTED.**